# Illinois Official Reports

## Appellate Court

---

### *In re J.O.*, 2021 IL App (3d) 210248

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.O. and J.P., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Brenda O., Respondent-Appellant). |
| District & No. | Third District<br>Nos. 3-21-0248, 3-21-0249 cons. |
| Filed | October 28, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, Nos. 17-JA-37, 17-JA-38; the Hon. Theodore G. Kutsunis, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | John L. Holmes, of Mason and Scott, P.C., of East Moline, for appellant.<br><br>Dora A. Villarreal, State's Attorney, of Rock Island (Patrick Delfino and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Karri A. Belvel, of Rock Island, guardian *ad litem*. |

PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1     Respondent, Brenda O., appeals following the termination of her parental rights by the Rock Island County circuit court. She argues that both the court's finding of unfitness and its subsequent finding that termination was in the best interests of the children were contrary to the manifest weight of the evidence. We reverse the order finding respondent unfit and vacate the subsequent order terminating respondent's parental rights.

¶ 2                                    I. BACKGROUND

¶ 3     On September 19, 2017, the State filed a petition for adjudication of wardship in case No. 17-JA-37, alleging that J.O. (born July 29, 2016) was a neglected minor. It filed a similar petition in case No. 17-JA-38, alleging that J.P. (born May 31, 2017) was also a neglected minor. Respondent is the mother of J.O. and J.P. The allegations in the petitions detailed two domestic violence incidents between respondent and their putative father, Joseph P.

¶ 4     The petitions alleged that Moline police responded to reports of domestic disputes on August 13 and September 28, 2017. Both children were in the family residence during each of the incidents. On the second occasion, police observed respondent to be intoxicated; a Breathalyzer test indicated that her blood alcohol level was 0.278. Joseph could not be located by the responding officer. Due to Joseph's absence, respondent's intoxication, and the absence of any family members in the area, the police contacted the Illinois Department of Children and Family Services (DCFS), which took protective custody of the children.

¶ 5     In addition to the petitions for adjudication of wardship, the State filed petitions for temporary custody with respect to both children. The court granted temporary custody to DCFS, and the children were placed in foster care. Bethany for Children & Families, a social services provider, filed a visitation plan for respondent on September 28, 2017. The plan indicated that supervised visits would be held for two hours on Tuesdays and Thursdays.

¶ 6     On February 22, 2018, based on respondent's and Joseph's admissions to the allegations in the petitions, the court found J.O. and J.P. to be neglected minors. Following a dispositional hearing held the same day, the court found it was in the children's best interests to be made wards of the court and continued their placement in foster care. The dispositional order required respondent to attend and complete parenting classes, obtain a substance abuse evaluation and submit to random drug testing, obtain a psychological evaluation and comply with all treatment recommendations, maintain appropriate housing and income, cooperate with counseling, and obtain a domestic violence assessment and comply with all treatment recommendations.

¶ 7     In permanency orders issued on August 23, 2018, and November 29, 2018, the court found that respondent had made neither reasonable efforts nor reasonable and substantial progress toward the children's return to home. On May 24, 2019, the court found that respondent had

made "minimal efforts and progress." In permanency orders dated August 30, 2019, and January 31, 2020, the court found that respondent *had* made reasonable and substantial progress toward the children's return to home. Reports from that time period indicated, *inter alia*, that respondent was engaged in counseling and progressing. She was also taking parenting classes and successfully implementing at home the techniques learned in those classes.

¶ 8 The State filed petitions for termination of parental rights in both cases on November 18, 2020. The petitions alleged that respondent[1] was unfit in that she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during the nine-month period from February 1, 2020, through November 1, 2020; and (3) failed to make reasonable progress toward the return of the children during the same nine-month time period. The petitions specifically alleged that respondent failed to engage in counseling, consistently participate in a parenting support coach program, maintain employment or appropriate housing, maintain sobriety and perform drug screenings, complete a new substance abuse evaluation, refrain from domestic violence incidents, attend the majority of visits with the children, and refrain from criminal activity. On the final point, the petitions alleged that respondent had been charged with residential burglary, criminal trespass, and burglary in two separate criminal cases. Respondent had been incarcerated since August 16, 2020.

¶ 9 A hearing on the State's petitions commenced on March 19, 2021. Kristy Hutchison testified that she became the caseworker in December 2019 and continued in that role throughout the nine-month period in question. The children had been in foster care for more than two years before Hutchison became involved in the case. Hutchison had reviewed the case file and spoken to the previous caseworker.

¶ 10 In questioning Hutchison, the State noted that "[t]he petition specifically *** refers to a specific period of time, February 1, 2020, through November 1, 2020, regarding the efforts and progress by the parents." The State continued: "I'm going to ask you basically to discuss how the parents were doing specifically during that period of time." Hutchison testified that when she took over the case, visits between respondent and the children were supervised. Hutchison observed that, "during that time period," respondent provided appropriate meals and activities for the children. Respondent struggled to manage two children at the same time. Hutchison noted that while respondent interacted with one child, "the other would go off and do things." When asked what the frequency of scheduled visits was during the nine-month period in question, Hutchison testified that visits were scheduled once a week for an hour.

¶ 11 In early March 2020, respondent was allowed to begin unsupervised visitation with the children. Two such visits were held on Monday and Wednesday in the first week of March, with a third scheduled for Friday. On the intervening Thursday, however, the police responded to a domestic violence report involving respondent. Respondent only visited once with the children after that point, in April 2020. Hutchison testified: "I do not know exactly why she stopped visiting, but it was after the domestic that first week in March that [respondent] disappeared completely ***. She came once in April, and then we didn't talk to her again for

---

[1]The petitions also sought to terminate the parental rights of the putative father, Joseph. However, Joseph is not a party to either of the instant consolidated appeals.

several months." Respondent "eventually" informed Hutchison that she had gone to live with family members elsewhere in the state. Respondent offered no explanation as to why she had not apprised Hutchison of that fact at the time. Hutchison confirmed that respondent had the ability to contact her. Hutchison did not learn about respondent's incarceration—which began on August 16, 2020—until October. Hutchison testified that no visits had occurred since respondent's incarceration due to COVID-19 restrictions at the jail.

¶ 12    Respondent completed a parenting class through the Family Advocacy Center, though Hutchison did not indicate when that class was completed. The class was followed by in-home coaching with the parents. Hutchison noted that the coaching "wasn't completed because of the fact that [respondent] wasn't participating in visits after March of 2020."

¶ 13    Respondent was not employed at any point since Hutchison became the caseworker. Respondent told Hutchison that she was not working so "she could stay at home and spend time with the children." Hutchison could not opine on what respondent meant by that, given that the children were in foster care at the time. Hutchison referred respondent to temp agencies and discussed potential positions based on respondent's job history, but respondent did not follow through with those recommendations. Hutchison reported that the family was struggling to make ends meet.

¶ 14    Hutchison "believe[d]" that respondent had completed an initial substance abuse screening prior to Hutchison's involvement in the case. She added that respondent "wasn't compliant with testing" after Hutchison became the caseworker. Hutchison requested testing "[a]t least once a month." The State asked if respondent had completed any drug tests after Hutchison took over the case. Hutchison responded: "Honestly, I can't recall if she did. I can't recall. I didn't review that. I'm sorry." When asked if she had "a concern with [respondent] missing at least a majority of requested screens," Hutchison responded affirmatively. She testified that those concerns related to March, April, and May 2020.

¶ 15    The police report from the March 2020 domestic incident indicated that respondent had been drinking alcohol. Hutchison requested a test immediately thereafter—even offering to drive respondent to the testing location herself—but respondent refused. A new substance abuse evaluation was also requested at that time. Respondent did not complete that evaluation. There was no opportunity to conduct substance testing once respondent became incarcerated.

¶ 16    Respondent completed a domestic violence class at some point prior to Hutchison's involvement in the case. A Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2020)) request filed by Hutchison following the March 2020 domestic incident revealed "several incidents of police responding to domestic violence incidents" from October 2019 through March 2020. Hutchison also became aware of a domestic violence incident from July 2020 in which police reported that respondent broke Joseph's phone. Neither respondent nor Joseph was ever charged with any offenses relating to domestic violence.

¶ 17    The State introduced exhibits showing that respondent was charged in August 2020 with residential burglary, a Class 1 felony, as well as criminal trespass arising out of the same incident. In a separate case, respondent was charged with burglary to a motor vehicle, a Class 3 felony. Docket entries from those cases indicated that the court had found a *bona fide* doubt as to respondent's fitness on October 8, 2020, and found her unfit to stand trial on December 9, 2020. At the time of the hearing on the State's petitions to terminate parental rights, those charges remained pending as respondent awaited transport to a mental health facility in the custody of the Department of Human Services.

¶ 18 Hutchison testified that respondent reported that she had engaged in psychiatric services while in custody and was currently taking medications in relation to that. There was no written documentation of that fact. Hutchison noted that visitation with the children could recommence when restrictions related to the COVID-19 pandemic were lifted.

¶ 19 The State then shifted its line of questioning to Joseph, directing Hutchison: "I guess give an overall summary but again specifically talk about that February 1st through November 1st time period." Hutchison agreed that, as far as she was aware, Joseph and respondent resided together through the entirety of the case. She did not know if the two remained together after the March 2020 incident but noted that each had reported to her that they were no longer together. Joseph remained at least partially engaged with Hutchison's agency after respondent "disappeared."

¶ 20 In March 2020, Joseph lost his full-time job and was evicted, along with respondent. Hutchison did not testify as to the reasons for either of those events.

¶ 21 On cross-examination, Hutchison clarified that she had not had "in-person contact" with respondent after her April 2020 visitation. After that, respondent had contacted Hutchison "once or twice" by telephone. On the first such occasion, respondent notified her that she was staying with her siblings out of town. In the second phone call, respondent informed Hutchison that she had moved to another home. "[A]ll the phone calls came from unidentified numbers. They were family members that the numbers were blocked." Hutchison did not recall the exact dates of those conversations. Respondent also contacted her once via Facebook.

¶ 22 Hutchison described on cross-examination the domestic incident that occurred in March 2020. Per Hutchison, Joseph returned early from work to find respondent intoxicated with another man. An argument ensued when the other man refused to leave. Joseph threw down a glass, breaking a table. At some point, respondent shoved Joseph. When police arrived, respondent and the other man left together. In the incident in July 2020, respondent broke Joseph's phone and threw rocks at him.

¶ 23 Hutchison testified that in-person visitations were halted in March 2020 due to the COVID-19 pandemic. Video visitation was still offered. Video visitation did not offer the same benefits as in-person visitation, especially with younger children, who get distracted easily and are not verbal enough to participate in a conversation. Hutchison agreed that "no visits were offered" to respondent after her incarceration due to COVID-19 protocols at the jail.

¶ 24 Hutchison agreed that domestic violence and substance abuse were the reasons that the children were originally removed from respondent's custody. Domestic violence in the home creates a risk of harm to the safety of the children. Hutchison opined that at no point in the nine-month period in question did respondent and Joseph stabilize their relationship. She had encouraged them to engage in both individual and couple's counseling. Hutchison denied that respondent and Joseph completed couple's counseling. When asked on cross-examination whether a November 2019 permanency report indicated that, in fact, they had completed couple's counseling, Hutchison replied: "I am not the individual who wrote that report."

¶ 25 Respondent testified that she became unemployed soon after giving birth to her daughter on May 20, 2019. She also testified that she became homeless "before March, *** before COVID." She did not testify as to why she and Joseph were evicted. Respondent stated that the COVID-19 pandemic "broke us completely." She added: "[W]hen you try to be homeless and stay sober, you're literally sick because you can't get sleep anywhere." Respondent reached out to multiple charitable organizations in attempts to procure housing. After arranging

quarters with the Salvation Army, respondent contacted Hutchison and later participated in a video visitation with the children. That visitation was brief. Respondent did not have a phone while she was homeless, and communication was difficult. Respondent's sister near Aurora briefly allowed respondent to reside with her. Respondent's daughter was currently living with that sister.

¶ 26    After receiving mental health treatment while in jail, respondent was diagnosed with anxiety and depression and was taking prescribed medications to address those issues. The period of homelessness during the pandemic exacerbated her mental health issues. Respondent felt more social and more positive since receiving treatment in the jail. She began her mental health treatment in September of 2020, approximately one month after she was originally incarcerated. Respondent had not consumed any alcohol since her incarceration.

¶ 27    Respondent engaged in couple's counseling with Joseph but admitted that she "coast[ed]" through the process. She was afraid that she would say something during counseling that would make her and Joseph "look horrible" and cause them to lose the children. Respondent explained that much of the friction between her and Joseph stemmed from Joseph's belief that he was not the biological father of J.O. She testified that her struggles with alcohol increased after the children were taken from her custody. She used alcohol to try to "escape the problems." She had not consumed any alcohol since being incarcerated.

¶ 28    To the extent relevant to the instant appeal, Joseph testified that he left respondent after the incident in March 2020. He was evicted that same month. They reconnected while living in the same motel in May, but Joseph testified that they maintained separate rooms and that their romantic relationship was not renewed.

¶ 29    The trial court found respondent and Joseph unfit on each of the three grounds alleged in the State's petitions. Following a best interests hearing on April 30, 2021, the trial court terminated respondent's parental rights.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, respondent contends that the State failed to establish by clear and convincing evidence any of the three grounds for unfitness alleged in its petition to terminate parental rights. Accordingly, she argues that the trial court's determination that she was unfit was contrary to the manifest weight of the evidence. Respondent also argues that the court's finding that termination was in the children's best interest was also contrary to the manifest weight of the evidence.

¶ 32    Before terminating parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (2020)), the trial court must find by clear and convincing evidence that the parent is unfit under the definitions provided in the Adoption Act (750 ILCS 50/1 (West 2020)). 705 ILCS 405/2-29(2) (West 2020). The grounds for unfitness under the Adoption Act include:

> "(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare[ and]
>
>                               * * *
>
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor ***, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period

- 6 -

following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(b), (m) (West 2020).

¶ 33 The heightened clear and convincing evidence standard is a constitutional requirement in termination cases. *Santosky v. Kramer*, 455 U.S. 745 (1982). Application of that standard reduces the risk that a fit parent will be found unfit while "underscor[ing] the importance of the parent's interest and the fact that such interest will not be extinguished lightly." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

> "A court's determination that clear and convincing evidence of a parent's unfitness has been shown will not be disturbed on review unless it is against the manifest weight of the evidence. [Citations.] A decision regarding parental fitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result." *In re D.D.*, 196 Ill. 2d 405, 417 (2001).

A finding that any one allegation has been proven by clear and convincing evidence is sufficient to sustain a parental unfitness finding on review. *In re D.H.*, 323 Ill. App. 3d 1, 9 (2001).

¶ 34                          A. Interest, Concern, or Responsibility

¶ 35 In determining whether the State proved by clear and convincing evidence that a parent has demonstrated an unreasonable degree of interest, concern, or responsibility as to their child's welfare, a reviewing court must "examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). It is the parent's efforts under the circumstances, rather than the success of those efforts, that must be examined. *Id.* at 279.

¶ 36 Efforts to visit and maintain contact with the child, as well as other indicia of interest, are relevant to the determination. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Contextual circumstances relevant to the inquiry include the parent's poverty or difficulty in obtaining transportation. *Id.* If personal visits are impractical, other contacts, such as phone calls or letters, may demonstrate the requisite levels of interest, concern, and responsibility. *Id.* Compliance with the directives of a service plan is relevant as well. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004).

¶ 37 The State's allegation of unfitness under section 1(D)(b) of the Adoption Act does not contemplate a specific time frame, unlike the nine-month time frame attendant to allegations arising user section 1(D)(m). See 750 ILCS 50/1(D)(b), (m) (West 2020). In considering an allegation under section 1(D)(b), the trial court would be required to consider evidence of the parent's conduct during the entire period between the loss of custody and the date of the fitness hearing. See, *e.g.*, *In re Adoption of Syck*, 138 Ill. 2d at 271 (observing that period between loss of custody and fitness hearing was relevant in determining reasonable degrees of interest, concern, and responsibility); see also *In re D.L.*, 191 Ill. 2d 1, 24 (2000) (Freeman, J., specially concurring) (contrasting time period applicable to section 1(D)(b) allegations with nine-month period contemplated by section 1(D)(m)).

¶ 38 In the instant case, the State was thus burdened with proving by clear and convincing evidence that respondent demonstrated an unreasonable degree of interest, concern, or responsibility as to the children's welfare between respondent's loss of custody on September 19, 2017, and the fitness hearing on March 19, 2021. The State was not merely required to

prove such unreasonableness during any particular day, week, month, or year but during the aggregate of the 42-month period. The State made no attempt to actually do so.

¶ 39 The only evidence presented by the State at respondent's fitness hearing was the testimony of Hutchison. Yet, Hutchison was the caseworker on the matter for less than half of the life of the case. She had no first-hand knowledge of any relevant facts in the case prior to December 2019. To the extent that Hutchison referenced any facts prior to that point in her testimony, she did so with a notable lack of specificity. Moreover, the State pointedly and frequently directed Hutchison to speak to only the nine-month period relevant to the allegations brought under section 1(D)(m) of the Adoption Act. While the prior record in the case was replete with permanency review reports detailing the entire life of the case, the State never requested that the trial court take judicial notice of those reports. The unavoidable conclusion is that the State was focused solely on the nine-month period related to the other two allegations in its petitions to terminate.

¶ 40 We do not doubt that evidence at a fitness hearing may tend to demonstrate an unreasonable degree of interest, concern, or responsibility during some time periods, yet also show a reasonable degree in other time periods. In such instances, it would be for the trial court to determine whether the overall degree of those elements was objectively unreasonable across the entire period. Such a conclusion is nearly impossible where, as here, almost no evidence is presented from 80% of the life of the case.

¶ 41 Even assuming that such a conclusion might be possible, the testimony provided by Hutchison regarding the nine months between February 1, 2020, and November 1, 2020, was not so compelling that it would amount to clear and convincing evidence of unreasonable interest, concern, or responsibility across the 42-month period as a whole.

¶ 42 A primary component of Hutchison's testimony was that respondent had missed all but one of her visits with the children after the domestic incident in early March of 2020. Hutchison repeatedly testified that respondent "disappeared" after that point. But Hutchison's later testimony established that she actually had a number of contacts with respondent throughout that spring. Respondent "came once in April" for a visitation, and respondent testified that that visit was, as one might expect, preceded by a phone call to Hutchison. Hutchison also testified that respondent later called her "once or twice," yet she was then able to detail each of two phone calls. On both occasions, respondent had called to inform Hutchison where she was living at the time. Hutchison also agreed that respondent had contacted her via Facebook. Hutchison did not testify to the precise time frame of any of these contacts, other than to acknowledge that they occurred after the April visit. In any case, Hutchison testified to *no* missed visitations by respondent from the time the children were removed from her custody through early March of 2020. Based on the two-visits-per-week schedule originally adopted by Bethany for Children & Families, this would have been more than 250 visits between respondent and the children for which Hutchison offered no testimony. In fact, her testimony tended to generally indicate that the visits were going quite well, given that they had progressed to the point of three unsupervised visits per week.

¶ 43 Additionally, our supreme court has made clear that we must consider respondent's lack of visitation "in the context of the circumstances in which that conduct occurred." *In re Adoption of Syck*, 138 Ill. 2d at 278. In this case, the overwhelming contextual consideration is the COVID-19 pandemic. Beginning in March 2020, respondent was navigating being homeless

and jobless[2] in the earliest days of the pandemic, a fact which would tend to make attending visitations especially difficult. Moreover, Hutchison testified that video visitation, made necessary by the pandemic, was especially ineffective when it involved children as young as J.O. and J.P. Finally, Hutchison explained that visitation was impossible during respondent's incarceration not because of the incarceration generally but because of the jail's COVID-19 protocols. No explanation was provided as to why video or telephone visitation was not offered to respondent.

¶ 44    Hutchison's testimony regarding alcohol use and testing was also internally inconsistent and often ambiguous. After initially asserting that respondent had been noncompliant with testing during her time as caseworker, Hutchison confessed that she actually had not reviewed that information and could not testify to the number of tests respondent submitted. Nevertheless, she agreed that respondent missed "a majority" of tests in March, April, and May. To what extent that testimony implies testing compliance in January, February, June, and July, is unclear. It is also unclear how the "at least once a month" testing requests were conveyed to respondent in March, April, and May if Hutchison was not in contact with respondent. Additionally, if respondent missed "a majority" of tests in those three months, the implication would seem to be that she submitted to *some* of the tests. No evidence was introduced as to the results of those tests.

¶ 45    Hutchison's testimony regarding domestic violence incidents involving respondent was also significantly lacking in detail. The violence between respondent and Joseph was a key subject in the case, as it was one of the main reasons that the children were originally removed from custody. Hutchison was able to describe only two such incidents occurring in the 42 months between loss of custody and the fitness hearing—one in March 2020 and one in July 2020. The details provided by Hutchison came from police reports; no charges were filed in conjunction with either incident. Of more concern, Hutchison often alluded to prior incidents, or a pattern of incidents, without any dates or information associated with those purported events. For instance, she testified that a FOIA request uncovered "several incidents of police responding to domestic violence incidents" from October 2019 through March 2020, but she provided no further details.

¶ 46    While Hutchison's testimony relating to her period of involvement in the case was, at least at times, less than compelling, the little testimony she did provide from prior to that period was largely positive for respondent. Respondent completed a parenting class through the Family Advocacy Center, though she did not continue with in-home parenting coaching after March 2020.[3] Respondent completed a substance abuse evaluation and a domestic violence class. When asked about a report that respondent had completed couple's counseling, Hutchison declined to speak on the report, despite having purportedly reviewed that report. Furthermore, as noted above, respondent's attendance and performance at scheduled visitations was apparently sufficient to allow visitations to proceed unsupervised.

---

[2]We note that respondent testified that she stopped working after giving birth to her daughter, at a time when Joseph had full-time employment. In addition, no evidence was presented to establish *why* respondent and Joseph were evicted just prior to the pandemic. The record allows no conclusion that respondent was in any way at fault for her circumstances at the outset of the pandemic.

[3]Respondent's lack of a home surely hindered her ability to participate in in-home coaching. Hutchison did not testify as to the extent of respondent's participation in coaching prior to March 2020.

¶ 47    Where the State was burdened with proving, by clear and convincing evidence, that the degree of interest, concern, or responsibility demonstrated by respondent in the welfare of her children over a 42-month period was unreasonable, it is not clear that that burden may be met when the State almost exclusively introduces evidence from a limited nine-month period. Even assuming that it was *possible*, the evidence from that nine-month period was not so compelling as to permit the conclusion, by clear and convincing evidence, that the totality of respondent's conduct across 42 months was demonstrative of an unreasonable degree of interest, concern, or responsibility. The court's finding to that effect was therefore contrary to the manifest weight of the evidence.

¶ 48                                              B. Efforts and Progress

¶ 49    A parent is unfit under section 1(D)(m)(i) of the Adoption Act where they fail to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(i) (West 2020). A parent is unfit under section 1(D)(m)(ii) of the Adoption Act where they fail to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect. *Id.* § 1(D)(m)(ii). The State need only prove one of the two grounds in order to demonstrate unfitness; accordingly, unreasonable efforts and unreasonable progress require separate analyses. *In re R.L.*, 352 Ill. App. 3d 985, 998-99 (2004). We note that much of our previous discussion of the shortcomings of the State's evidence (*supra* ¶¶ 42-45) is equally applicable to the allegations under section 1(D)(m).

¶ 50                                              1. Reasonable Efforts

¶ 51    The reasonable efforts inquiry is a subjective one, focusing on the efforts of the parent that would be reasonable for that parent under the circumstances. *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000). The inquiry is narrow, as it considers only the correction of those conditions originally providing the basis for removal of the children. *Id.* "Parental deficiencies collateral to the conditions that were the basis for the child's removal, even if serious enough to prevent the return of the child, are outside the scope of this inquiry and are therefore not relevant." *Id.* In the instant case, the conditions that created the basis for the removal of the children were respondent's abuse of alcohol and her involvement in domestic altercations with Joseph. We must only consider if the State proved by clear and convincing evidence that respondent's efforts to correct those conditions between February 1, 2020, and November 1, 2020, were unreasonable under the circumstances.

¶ 52    Initially, the State presented no evidence that respondent made anything less than reasonable efforts to curb her abuse of alcohol or avoid conflict with Joseph during February 2020. As discussed above, the progression to unsupervised visitation in early March tends to indicate that those efforts were satisfactory. Similarly, respondent testified that she had not consumed any alcohol since being incarcerated on August 16, 2020, and it may be presumed that there had been no domestic incidents in that same span.

¶ 53    Hutchison testified that the police reported respondent to be intoxicated during the March 6, 2020, altercation with Joseph. Respondent affirmatively declined a drug test immediately thereafter. This was the only evidence presented by the State showing that respondent consumed alcohol at any point between February 1, 2020, and November 1, 2020. Respondent herself testified as to the difficulties in staying sober while homeless during the earliest months

- 10 -

of the pandemic. While acknowledging those difficulties, respondent did not testify that she consumed alcohol at any point during the nine-month period. Moreover, as previously discussed, Hutchison's testimony concerning respondent's compliance with substance testing was inconsistent and incomplete. *Supra* ¶ 44.

¶ 54    Regarding domestic violence, Hutchison testified—through reference to police reports—to two incidents between respondent and Joseph during the nine-month period. The first of those, on March 6, 2020, apparently caused respondent and Joseph to go their separate ways for some amount of time. While Hutchison opined that respondent and Joseph had not been able to stabilize their relationship at any point in the nine-month period, that testimony was undermined by her own testimony that she was out of contact with both respondent and Joseph for large portions of that period. It is unclear how Hutchison could have known anything about the state of their relationship in the spring of 2020. In fact, Hutchison testified that both respondent and Joseph reported to her that they were no longer together, and Hutchison provided no reason to doubt those reports.

¶ 55    Hutchison testified that respondent and Joseph needed both individual and couple's counseling in order to solve their relationship problems. Respondent's failure to pursue those courses during the lockdown phase of the pandemic cannot be deemed unreasonable. In fact, under the circumstances, the most reasonable course of action for respondent to avoid further conflicts with Joseph would be for her to remove herself from his presence. Indeed, the evidence at the fitness hearing tended to indicate that that was precisely what occurred, as respondent and Joseph separated for a period of time. Joseph testified that they never restarted their romantic relationship. Considering these facts, and the near total lack of evidence relating to respondent's alcohol use, the State did not prove by clear and convincing evidence that respondent's efforts to correct the conditions that led to her separation from the children were unreasonable.

¶ 56                    2. Reasonable Progress

¶ 57    "[T]he benchmark for measuring a parent's progress under section 1(D)(m) of the Adoption Act must take into account the dynamics of the circumstances involved ***." *In re C.N.*, 196 Ill. 2d 181, 216 (2001) The focus is on "the amount of progress toward the goal of reunification one can reasonably expect from the parent under the circumstances." *In re J.A.*, 316 Ill. App. 3d at 564. Progress is considered in light of both the circumstances that gave rise to the original loss of custody as well as any other conditions that later become known. *In re C.N.*, 196 Ill. 2d at 216-17. "Reasonable progress relates to progress toward the broadly defined goal of the return of the child to the natural parent. [Citation.] The standard by which progress is to be measured is parental compliance with the court's directives, the DCFS service plan, or both." *In re J.A.*, 316 Ill. App. 3d at 564. "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re M.C.*, 201 Ill. App. 3d 792, 798 (1990).

¶ 58    The court ordered that respondent attend and complete parenting classes, obtain a substance abuse evaluation and submit to random drug testing, obtain a psychological evaluation and comply with all treatment recommendations, maintain appropriate housing and income, cooperate with counseling, and obtain a domestic violence assessment and comply with all treatment recommendations. We must consider the extent to which respondent's compliance

or noncompliance with these directives was objectively unreasonable and, thus, the extent to which her progress toward reunification was objectively unreasonable.

¶ 59　　The State on appeal insists that respondent's attempt to invoke the COVID-19 pandemic to contextualize her progress is unavailing because "her issues arose prior to the beginning of the Covid-19 pandemic mitigation efforts." It is true that the evidence establishes that respondent's early March 2020 eviction was unrelated to the pandemic. However, absent any evidence on the record regarding why respondent was evicted, it is impossible to make any sort of reasonableness determination with respect to respondent's untimely loss of housing. More importantly, respondent's attempts to procure housing after that point were plainly impacted by the pandemic. Likewise, it is difficult to hold respondent at fault for failing to find employment in the early months of the pandemic. Given the circumstances, respondent's coordination of housing through family and through charitable organizations during the early months of the pandemic may be described as reasonable progress.

¶ 60　　Further, the pandemic would have impacted respondent's ability to comply with random drug testing. As discussed above (*supra* ¶ 44), Hutchison testified that respondent did not comply with a majority of testing requests that spring; yet, she also testified that she had no way of contacting respondent, leaving it unclear how, or if, those requests were conveyed to respondent. While Hutchison testified that she offered to transport respondent to one test in the immediate aftermath of the March incident—and respondent declined—it is unclear how respondent would have been able to participate in further testing or even if such testing was continuing during the lockdown phase of the pandemic. That respondent was apparently able to comply with some testing seems reasonable under the circumstances.

¶ 61　　Next, Hutchison testified that respondent had completed parenting classes as required by the court's order. However, Hutchison added that respondent failed to follow through with in-home coaching, not mentioned in the court order, after March 2020. In addition to respondent's lack of a home standing as a serious hindrance to that coaching, no testimony was offered establishing that the in-home coaching even continued to be offered in the early months of the pandemic.

¶ 62　　In addition, respondent testified that the pandemic, and her situation at its outset, exacerbated her mental health issues, namely her depression. The State did not refute that testimony. Rather, the introduction of the fact that respondent was found unfit in her pending criminal case tends to confirm it. During the nine-month period, respondent had engaged in psychiatric services through the jail and was presently taking prescribed medications to address her mental health issues.[4] Respondent testified that she felt more positive and more social since beginning treatment.

¶ 63　　Faced with homelessness and joblessness at the outset of a global pandemic, respondent was able to procure sporadic housing, largely separated herself from the source of her domestic strife, and took affirmative steps to address her mental health issues. While respondent was in far from perfect compliance with the court order during the nine months in question, much of

---

[4]The State asserts that respondent's engagement in mental health services in jail was "due to respondent being found unfit to stand trial and nothing to do with her responsibility towards the children [*sic*]." This assertion is unsupported by the record. In fact, if respondent's testimony that she engaged in services in September 2020 is credited, the State's assertion is *rebutted* by the record, which shows that a *bona fide* doubt as to respondent's fitness to stand trial was first raised in October 2020.

that noncompliance can be traced to the unprecedented circumstances in which she found herself. It is apparent to us that the State did not prove that respondent's progress during the nine-month period was clearly and convincingly unreasonable. Having found that the State failed to prove respondent unfit on any grounds under the Adoption Act, we reverse the trial court's ruling finding her unfit. We also, therefore, vacate the trial court's order terminating respondent's parental rights.

¶ 64 In closing, we are compelled to address our fundamental concern with the instant case. Under the relevant statutes, the State would have been justified in bringing unfitness proceedings against respondent when, according to the court, she failed to demonstrate reasonable efforts or progress within a year of the children's removal from custody. *Supra* ¶ 7. Wisely, the State elected not to do so. That decision paid off, as respondent showed gradually more progress toward reunification with the children over the next 15 months. Among other positive results, respondent was engaged and progressing in counseling and was successfully implementing techniques from her parenting classes. As a result of this progress, respondent was given unsupervised visitation with the children.

¶ 65 In March 2020 came the COVID-19 pandemic and with it a time of mass confusion, uncertainty, and upheaval. The State would have us believe that the concomitant downturn in respondent's performance beginning at that same time was mere coincidence. An order terminating parental rights permanently severs that relationship. "Few forms of state action are both so severe and so irreversible." *Santosky*, 455 U.S. at 759. That the State would attempt to terminate the parental rights of a parent making serious, measurable progress toward reunification, and do so based *solely* on the parent's performance during the first eight months of the pandemic, is extremely troubling.

¶ 66                                      III. CONCLUSION
¶ 67 The judgment of the circuit court of Rock Island County is reversed.

¶ 68 Reversed.

¶ 69 JUSTICE SCHMIDT, dissenting:
¶ 70 The majority reverses the trial court's decision finding respondent unfit. The majority claims this decision is against the manifest weight of the evidence. A court's determination that clear and convincing evidence of a parent's unfitness has been shown will not be disturbed on review unless it is against the manifest weight of the evidence. *In re D.L.*, 191 Ill. 2d at 13; *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997). The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Based on the evidence presented, one cannot say that the trial court's decision was unreasonable, arbitrary, or not based on the evidence. The court did not err in finding that respondent failed to make reasonable progress.

¶ 71 The trial court found respondent unfit due to her failure to make reasonable progress toward the return of the minors within nine months. Reasonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. The benchmark

for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court directives, in light of the condition that gave rise to the removal of the child and other conditions that later become known that would prevent the court from returning custody of the child to the parent. *In re C.N.*, 196 Ill. 2d at 216-17. Failure to make reasonable progress toward the return of the minor includes the parent's failure to substantially fulfill his or her obligations under the service plan and failure to correct the conditions that brought the child into care. *Id.* at 217. A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground. *In re D.D.*, 196 Ill. 2d at 422.

¶ 72    The court ordered that respondent attend and complete parenting classes, obtain a substance abuse evaluation and submit to random drug testing, obtain a psychological evaluation and comply with all treatment recommendations, maintain appropriate housing and income, cooperate with counseling, and obtain a domestic violence assessment and comply with all treatment recommendations.

¶ 73    This case arose due to domestic violence and substance abuse issues. Respondent did attend couple's therapy classes but gained no insight from those classes. She even testified that when attending the classes, she "did everything to coast through it and get done as soon as possible." Despite taking those classes, respondent continued to be involved in domestic violence incidents with Joseph P. throughout the case. Respondent failed to complete most of the requested drug testing and admitted to abusing alcohol. Respondent was unemployed prior to the pandemic. She lost her housing prior to the pandemic. She did not reach out to the caseworker for assistance. Instead, she called the caseworker from a hidden phone number. Respondent stopped participating in visitation and did not utilize video visitation. Respondent attempts to excuse her failure to participate in visits and other services based on her incarceration. Her incarceration is not an excuse. See *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167 (2003). Based on this evidence, the trial court's finding that respondent failed to make reasonable progress toward the goal of reunification is not against the manifest weight of the evidence.

¶ 74    The majority attempts to excuse respondent's failure to make reasonable progress by relying on the impact of the pandemic. The majority assumes the pandemic prevented respondent from complying with drug testing, obtaining housing, and securing employment. However, there is no evidence that the pandemic did affect respondent's ability to make progress toward any of these goals. Some of the majority's assumptions are contradicted by the record. For example, the majority assumes respondent could not comply with random drug testing due to the pandemic. But the caseworker offered to provide respondent with transportation for testing. Respondent declined. Respondent was not employed at any point while Hutchinson was the caseworker. Respondent told Hutchinson she was not working so "she could stay at home and spend time with the children." This is puzzling given the children were in foster care at the time. Hutchinson referred respondent to temp agencies and discussed potential jobs, but respondent did not follow through.

¶ 75    Given that the majority reverses on the above finding, it does not address whether the trial court erred in finding it to be in the minors' best interests to terminate respondent's parental rights. At the best-interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The State bears the burden of proving by a preponderance of the evidence that

termination is in the best interests of a minor. *Id.* at 366; *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010). Section 1-3(4.05) of the Juvenile Court Act of 1987 sets forth various factors for the trial court to consider in assessing a minor's best interests. 705 ILCS 405/1-3(4.05) (West 2020). These considerations include (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) the minor's familial, cultural, and religious background; (4) the minor's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes and goals; (6) community ties; (7) the minor's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. *Id.*

¶ 76 The statutory factors weigh in favor of terminating respondent's parental rights. The foster family provided for the minors' physical safety and welfare, including food, shelter, clothing, and health. The minors were happy, content, and well-adjusted with their foster family. The minors continue to live together with their foster family. The minors have bonded with their foster family and look to them for comfort. They currently live in a stable, loving environment. The need for permanence favors termination. The minors have spent almost their entire lives with their foster parents. There is no indication that respondent will ever become fit or have the ability to care for the minors. The trial court did not err in finding it to be in the best interests of the minors to terminate respondent's parental rights.

¶ 77 We should affirm the trial court.