NOTICE

Decision filed 03/30/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210369-U

NOS. 5-21-0369, 5-21-0370, 5-21-0371,

5-21-0372 cons.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.E., B.F., J.F., and N.F., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Effingham County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 19-JA-19, 19-JA-20 |
| v. | ) | 19-JA-21, 19-JA-22 |
| | ) | |
| Patricia E., | ) | Honorable |
| | ) | Christopher W. Matoush, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that the respondent mother was unfit is affirmed where the State proved she was unfit by clear and convincing evidence.

¶ 2    The respondent mother, Patricia E., appeals the judgment of the circuit court of Effingham County terminating her parental rights to her minor children, A.E., B.F., J.F., and N.F. On appeal, Patricia argues that the court's findings that she was an unfit parent under sections 1(D)(m)(i) and (m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)) were erroneous because

1

the State failed to prove her unfit by clear and convincing evidence.[1] For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Patricia E. is the biological mother of A.E., born August 6, 2008, B.F., born August 31, 2014, J.F., born May 6, 2017, and N.F., born September 13, 2018. The children's biological fathers, Justin E. and Justin F., are not parties to this appeal and will only be discussed as necessary to provide relevant background for the issues presented.

¶ 5      A case was opened by the Illinois Department of Children and Family Services (DCFS) in October 2018 due to Patricia's substance abuse issues, which included the use of methamphetamine during the pregnancy of her fourth child, as well as mental health issues. A safety plan was developed that allowed the family to remain together. However, on April 3, 2019, DCFS received a call from a reporter stating that she believed Patricia and Justin F. were using drugs and the four children were at risk.

¶ 6      On April 11, 2019, the State filed petitions for adjudication of wardship for A.E., B.F., J.F., and N.F. alleging the children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because their environment was injurious to their welfare. The petitions alleged that Patricia had a history of abusing illicit substances and not complying with mental health treatment that rendered her incapable of providing suitable care and a proper environment for her children. More specifically, the petition alleged that Patricia had a history of abusing methamphetamine and a diagnosis of bipolar disorder.

---

[1]Patricia E. also listed as an issue that the trial court's termination of her parental rights was erroneous; however, her argument for this issue consisted of one sentence claiming that the case should never have proceeded to the second stage hearing. This argument fails to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) ("Argument *** shall contain the contentions of the appellants and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are forfeited ***."). As such, we find this argument forfeited.

2

The petition further alleged that a prior safety plan was developed to prevent removal of the children, but that Patricia was not sufficiently participating because she (1) was not attending substance abuse counseling, (2) was not taking her medications for bipolar disorder, and (3) failed to appear for numerous drug screens as required by the plan. Additionally, the petition alleged that Patricia's mental health issues were exacerbated by her substance abuse problems, she recently engaged in erratic behavior, she failed to consistently send A.E. to school, and as a result of her substance abuse and mental health issues, could not provide suitable care for the minor children.

¶ 7    A shelter care hearing was held on April 11, 2019, at which time testimony was provided in support of the allegations. Thereafter, the trial court found probable cause was demonstrated to show the children were neglected and that it was a matter of urgent and immediate necessity that shelter care be ordered for the protection and safety of the minor children.

¶ 8    A visitation plan was filed on April 24, 2019, which allowed Patricia and Justin F. supervised visitation. A family service plan was prepared with a permanency goal to have the children returned home in 12 months. Patricia was to complete a substance abuse assessment and follow recommendations, submit to random drug testing, refrain from using drugs or alcohol, refrain from associating with anyone who used drugs, complete a mental health assessment and follow recommendations, see a psychiatrist, complete a full psychiatric assessment, take medication as prescribed, sign a consent to release the mental health records to DCFS, and attend therapy to address dependency issues, domestic violence, her mother's death, and the children's removal. Patricia signed the family service plan on May 14, 2019.

¶ 9    An adjudicatory hearing was held on August 28, 2019, at which time Patricia stipulated to the State's allegations in paragraphs 3(a)(1), (a)(2), and (a)(4), which stated the children were neglected because Patricia had a history of using illicit substances such as methamphetamine,

significant mental health issues, including a diagnosis of bipolar disorder, and those issues along with her substance abuse, caused her to engage in erratic behavior. The State withdrew the allegations in paragraphs 3(a)(3) and (5). The court accepted the stipulation.

¶ 10    An integrated assessment was filed on September 11, 2019. Patricia's substance abuse history indicated that she started smoking marijuana at age 15, used Fentanyl and K2 in 2012, was clean for about seven or eight months, and returned to using K2 but stopped while she was pregnant with B.F. Patricia began using methamphetamine after the birth of B.F. and progressed to daily use 3½ months later. Patricia's methamphetamine use decreased to one or two times a month while she was pregnant with J.F., but after his birth she returned to daily use, sometimes more than once a day. This continued until she became pregnant with N.F. when she decreased her usage to three or four times a month. After N.F.'s birth, Patricia returned to daily use of methamphetamine. Patricia also reported prior diagnoses of bipolar, depression, personality disorder, and a learning disability. She was receiving Supplemental Security Income (SSI) for her bipolar disease and depression.

¶ 11    A dispositional report was also filed on September 11, 2019, that recommended findings that the parents were unable to care for, protect, train, educate, supervise, or discipline the children and placement with them was contrary to the children's health, safety, and best interests. The report recommended making the minors wards of the court, granting custody and guardianship to DCFS, and setting a permanency goal at that time to return the children home.

¶ 12    At the September 25, 2019, hearing Patricia agreed to the court issuing a dispositional order consistent with the report recommendations. She was admonished to continue to cooperate with DCFS and work on her service plan. The court further admonished her that if there was not substantial progress she was at risk of losing her parental rights.

4

¶ 13    On January 8, 2020, an adjudicatory order was issued regarding A.E. after Justin E. was defaulted. The court found that the allegations in the petition were proved by a preponderance of the evidence. The dispositional order adjudicated A.E. neglected, made her a ward of the court, and granted guardianship and custody to DCFS. The agency submitted a permanency hearing report on February 26, 2020, which noted the children had been in substitute care for 323 days. The recommended permanency goal remained "return home within 12 months." The report indicated that Patricia made "remarkable progress in services." She moved from Effingham to Macon to remove herself from negative influences, engaged in substance abuse counseling, and attended Narcotics Anonymous/Alcoholics Anonymous groups and mental health counseling at Crossing Healthcare in Decatur. Patricia's random drug screens were negative, and she was engaging in domestic violence counseling and receiving parenting, housing, and budgeting training. She attended all of the visitation meetings with her children and continued to do well. The recommended permanency goal remained at return home within 12 months. On March 11, 2020, the case proceeded for a permanency review. The trial court noted that the DCFS permanency report was favorable, reunification was near, and offered further encouragement to Patricia. The status hearing on June 3, 2020, was equally positive.

¶ 14    On September 2, 2020, DCFS submitted a permanency hearing report that noted the children had been in substitute care for 510 days. The report noted that Patricia's progress declined in the prior six months. She began using methamphetamine again in March 2020 and "continued to use up to this point." Patricia was no longer attending her private or group counseling sessions. The therapists spoke with Patricia about getting inpatient treatment, but she declined because Justin F. would not go as well. Patricia's March 11, 2020, drug test was negative. She then failed to appear for testing on May 6, 2020, May 8, 2020, and May 27, 2020. On May 29, 2020, Patricia

5

tested positive for methamphetamine but denied using. She failed to appear for the June 16, 2020, drug test and her June 22, 2020, drug test was negative. However, her July 22, 2020, drug test was positive for amphetamines and methamphetamine, at which time Patricia admitted she was using again. Patricia failed to appear for her August 19, 2020, drug testing. At the September 9, 2020, hearing, the trial court was advised that the case was proceeding to legal screening in the next 90 days. The permanency goal of return home remained intact, and the case was scheduled for a permanency hearing on January 20, 2021.

¶ 15    On January 20, 2021, the court was advised that the case passed legal screening and the State was in the process of preparing petitions to terminate parental rights. The Court Appointed Special Advocates (CASA) report indicated that Patricia was still using drugs as of November 23, 2020, and December 18, 2020. Her behavior at the January 8, 2021, visitation was also suspicious for drug use.

¶ 16    The State filed petitions for termination of parental rights and appointment of guardian with power to consent to adoption on January 28, 2021. The petitions alleged that Patricia failed to make reasonable efforts to correct the conditions that were the basis of the removal in the nine-month period from January 8, 2020, to October 8, 2020. The petitions further alleged that Patricia failed to make reasonable progress toward the return of the children during the same period. A pretrial hearing was held on March 17, 2021, at which time the permanency goal was changed to substitute care pending termination of parental rights. The fitness hearing was scheduled for May 4, 2021, but was continued because the State filed amended petitions to terminate parental rights with the same allegations but changing the nine-month period to March 25, 2020, to December 25, 2020.

6

¶ 17    The fitness hearing was held on June 7, 2021. Sarah Davidson, a child welfare specialist for DCFS, and the caseworker during the pendency of the case, was the only witness. She testified that Patricia's service plan required a substance abuse assessment and follow up recommendations, random drug screenings, a mental health assessment and follow up recommendations, and appropriate housing. Davidson testified that Patricia completed the assessments, started counseling, and as of April 15, 2020, was achieving her goals. Thereafter, Patricia stopped going to her appointments on a consistent basis, relapsed, and went back to using methamphetamine. The first positive test occurred in May. When confronted with the positive result, Patricia denied using and stated she just had a procedure performed and asked if there was any antibiotic that would cause a positive test for the methamphetamine. Davidson testified that she was unaware of any antibiotic that would cause that result. She stated that Patricia tested positive again in July for methamphetamine. When Davidson spoke with Patricia's therapist, the therapist confirmed that Patricia had been using since March 2020. The counselor advised Davidson that she recommended inpatient treatment for Patricia, but she declined because she was living with Justin F. at that time and knew he would not go as well. Davidson stated they had a family meeting in September 2020, but Patricia's attendance was sporadic for her counseling sessions, and she continued to have positive drug tests. Davidson stated that during COVID, Patricia did not advise her of any issues that were barring her from participating in services. Davidson noted the services were available by telephone and internet, which was not an issue as evidenced by Patricia's use of those methods to participate in visitation. With regard to the inpatient treatment, three facilities, including the one where Patricia was already receiving services, were offered, but she refused that treatment.

¶ 18    Following Davidson's testimony, the State rested, and no further evidence was presented by any of the parties. The trial court found that Patricia made some progress, but the key issue was

7

the substance abuse. The court focused on Patricia's relapse while receiving outpatient treatment, her refusal of inpatient treatment, and the underlying reason for refusing the referral. The court noted that Patricia "specifically chose" not to enter inpatient treatment and found that Patricia made "a calculated response" when she chose not to go into residential treatment. The court found that Patricia's cessation of outpatient treatment and refusal of inpatient treatment was clear and convincing evidence of her failure to make reasonable progress. It said, "Anyone else in that situation that was given that opportunity that chose not to take that opportunity like you did, that's not reasonable." The trial court found that Patricia was unfit for failing to make reasonable effort to correct the conditions that were the basis of the children's removal and failing to make reasonable progress toward the return of the children during the requisite nine-month period.

¶ 19    On August 17, 2021, CASA filed a report in anticipation of the best interest hearing stating that N.F. was thriving in his foster home and bonded with his three foster siblings. A.E., B.F., and J.F. were all in school and were also doing well in their foster home. CASA noted that A.E. and B.F. wished to live with Patricia but found it was in the best interest of the children for parental rights to be terminated and allow the children to be adopted by their foster parents.

¶ 20    The best interest hearing was held on August 19, 2021, and after a full day of testimony, was continued to September 14, 2021. At the beginning of the September 14, 2021, hearing, the court was advised that Patricia planned to sign a surrender of parental rights and thereafter reset the matter for September 15, 2021. On September 15, 2021, the State advised the court that Patricia was not signing the surrender and rested its case. A.E.'s grandmother testified that A.E. was "torn" because she wanted to stay with the foster family but also wanted to go home to her mother. Patricia also provided testimony regarding her relationship with her children, her last positive drug test on January 19, 2021, her current home, and the card she recently received from A.E. Following

8

arguments, the trial court took the matter under advisement. On October 13, 2021, the trial court addressed each child separately and found it was in the best interests of each child to terminate Patricia's parental rights. Patricia appealed on November 2, 2021.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, Patricia argues that the State failed to prove by clear and convincing evidence that she failed to make reasonable efforts to correct the conditions that were the basis of the children's removal and failed to make reasonable progress towards the return of the minor children for the period from March 25, 2020, to December 25, 2020, pursuant to sections 1(D)(m)(i) and (m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)). She does not dispute that during the nine-month period at issue, she relapsed and was using methamphetamine through the entire period. Instead, she argues that her relapse during COVID was no coincidence, and it was difficult for her to attend group counseling sessions in the media provided during the pandemic. In support, Patricia relies on *In re J.O.*, 2021 IL App (3d) 210248, ¶ 65, which found it "extremely troubling" that the State proceeded with termination of parental rights "based solely on the parent's performance during the first eight months of the pandemic."

¶ 23    "In order to reverse a trial court's finding that there was clear and convincing evidence of parental unfitness, the reviewing court must conclude that the trial court's finding was against the manifest weight of the evidence." *In re C.N.*, 196 Ill. 2d 181, 208 (2001) (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 274 (1990)). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent "or the determination is unreasonable, arbitrary, or not based on the evidence." *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 24    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 40/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)).

After a petition for involuntary termination is filed under the Juvenile Court Act, a two-step process is required for parental right termination. 705 ILCS 405/2-29(2) (West 2018). The State must first establish, by clear and convincing evidence, that the parent is unfit under one of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2), (4) (West 2020). Each statutory ground is independent and therefore the trial court's finding may be affirmed where evidence supports a finding of unfitness for any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 25     "Parental rights and responsibilities are of deep human importance and will not be lightly terminated." *In re Paul*, 101 Ill. 2d 345, 351-52 (1984). Here, the trial court found that Patricia was unfit under sections 1(D)(m)(i) and (m)(ii) of the Adoption Act because she (1) failed to make reasonable efforts to correct the conditions that were the basis for the children's removal and (2) failed to make reasonable progress towards the children's return home during the nine-month period from March 25, 2020, to December 25, 2020.

¶ 26     Reasonable efforts and reasonable progress are two distinct unfitness grounds under section 1(D)(m). *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066 (2006). Reasonable efforts are judged by a subjective standard based upon the amount of effort that is reasonable for that particular parent. *In re C.C.*, 299 Ill. App. 3d 827, 829 (1998). "The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to" the children's removal. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34.

¶ 27     We note that " '[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value.' " *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203 (2008) (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1064). However, even if a factual comparison to *In re J.O.* was

worthwhile, we find this case is distinguishable. In *In re J.O.*, the children were removed due to mother's alcohol abuse and domestic altercations with her significant other. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 51. There, the mother lost her job and became homeless prior to COVID and testified that the COVID-19 pandemic " 'broke us completely.' " *Id.* ¶ 25. During that time, she reached out to multiple charitable organizations for assistance and eventually arranged housing with the Salvation Army. *Id.* Thereafter, the mother contacted the caseworker and participated in visitation with her children. *Id.* She had no phone while she was homeless, making communication difficult. *Id.* The evidence also revealed only one instance of alcohol use and two incidents of domestic violence early in the nine-month period that resulted in the parties separating and mother ultimately removing herself from the relationship. *Id.* ¶¶ 53-54. As such, the court found that mother made reasonable efforts to correct the conditions that were the basis of her children's removal. *Id.* ¶ 55.

¶ 28    In the case at bar, A.E., B.F., J.F., and N.F. were taken into care due to Patricia's continued methamphetamine use and her failure to take medication for her bipolar disorder and depression. Unlike the mother in *In re J.O.*, Patricia was never employed, remained in suitable housing, and had access to a phone that allowed her to continue to receive services, as well as visitation with her children, during the pandemic. The evidence also revealed that Patricia initially lied about her methamphetamine use in May 2020 and instead blamed the positive test on an antibiotic, continued to use methamphetamine, and after admitting her relapse in July 2020, declined the opportunity presented for inpatient treatment for her drug use because her boyfriend would not also participate. As for her mental health counseling, while Patricia contended that the group sessions were more difficult due to so many people being online at the same time, she also declined the opportunity to participate in personal weekly counseling sessions with her therapist. The evidence also revealed

11

that despite a family meeting in September 2020, mother continued with sporadic attendance in counseling sessions and continued to test positive for drugs throughout the remainder of 2020.

¶ 29    None of this evidence supports a finding of reasonable efforts to correct the drug abuse and mental health conditions that were the basis of the children's removal. While there is no dispute that large segments of the population incurred difficulties during the pandemic, when opportunities were presented to assist Patricia with the difficulties as well as her underlying substance abuse and mental health issues, she rejected the assistance and continued to use drugs. As such, the trial court's finding that the State proved by clear and convincing evidence that Patricia failed to make reasonable efforts to correct the conditions that were the basis for her children's removal from March 25, 2020, to December 25, 2020, is not against the manifest weight of the evidence.

¶ 30    Reasonable progress is judged from an objective standard that focuses on the steps a parent takes toward the reunification goal. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. To assess progress, the court considers a parent's compliance with service plans and the court's directives in light of the conditions that gave rise to the children's removal, and subsequent conditions that prevent the court from returning custody of the children to the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.*

¶ 31    Here, the major components of Patricia's service plan required a cessation of illicit drug use, random drug testing, along with substance abuse and mental health counseling. While Patricia was making progress and all the parties believed that reunification was forthcoming prior to April 2020, the evidence revealed a departure from progress as early as March 2020, when mother relapsed. Drug testing was initially discontinued in the early months of the pandemic shutdown but returned in May 2020. At that time, Patricia tested positive. She subsequently admitted

12

continual use of methamphetamine since March 2020 and declined to avail herself of the services offered.

¶ 32　While we again recognize that Patricia's relapse was concurrent with the pandemic, there was no evidence presented, unlike the mother in *In re J.O.*, that Patricia made any progress toward a return of the children during the requisite nine-month period. Instead, the evidence revealed, that despite what was likely an anxious and concerning time for her children, Patricia repeatedly took actions that undermined any chance of reunification in the near future by continuing to use methamphetamine and choosing her relationship with her boyfriend over her relationships with her children. As such, the trial court's finding that Patricia failed to make reasonable progress toward reunification with her children is not against the manifest weight of the evidence.

¶ 33　　　　　　　　　　　　　III. CONCLUSION

¶ 34　For the reasons stated herein, we affirm the trial court's findings that Patricia was unfit based on a failure to make reasonable efforts to correct the conditions that were the basis for the children's removal and a failure to make reasonable progress toward reunification with the children during the requisite nine-month period.

¶ 35　Affirmed.