2022 IL App (2d) 220156-U
No. 2-22-0156
Order filed October 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* S.R., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | |
| | ) | No. 20-JA-54 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. S.S., | ) | Kathryn Karayannis, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We grant appellate counsel's motion to withdraw and affirm the trial court's judgment terminating respondent's parental rights, concluding there exist no issues of arguable merit to be raised on appeal.

¶ 2    Respondent, S.S., appeals from the trial court's order finding her unfit to parent her daughter, S.R., and terminating her parental rights. Her appellate counsel has moved to withdraw under *Anders v. California,* 386 U.S. 738 (1967), stating that he has read the record and concluded there exist no issues of arguable merit to be raised on appeal. See *In re S.M*., 314 Ill. App. 3d 682, 685 (2000) (holding *Anders* applies to cases involving termination of parental rights). Counsel has supported his motion with a memorandum of law providing a statement of facts, potential

issues, and argument as to why those issues lack arguable merit. Counsel served respondent with a copy of the motion and memorandum. We advised respondent that she had 30 days to respond to counsel's motion. That time has passed, and no response was filed. We conclude that this appeal lacks arguable merit based on the reasons set forth in counsel's memorandum. Therefore, we grant counsel's motion and affirm the trial court's judgment.

¶ 3     We note that this appeal was accelerated under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to that rule, the appellate court must, except for good cause shown, issue its decision in an accelerated case within 150 days of the filing of the notice of appeal. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, respondent filed her notice of appeal on May 11, 2022, and her amended notice of appeal on May 18, 2022. On July 6, 2022, respondent filed a motion seeking (1) a limited remand so respondent could surrender her parental rights and consent to the adoption and (2) to withdraw the appeal. On July 25, 2022, this court denied the motion for limited remand and denied, without prejudice, the motion to withdraw the appeal. Respondent's counsel was ordered to file a motion to withdraw as counsel in accordance with *Anders* within 35 days. Counsel filed his motion to withdraw on August 29, 2022; respondent was given until October 3, 2022, to respond (7 days before the 150-day period expired). Due to these circumstances, we find good cause for this decision to be issued after the time frame mandated by Rule 311 (a).

¶ 4                                    I. BACKGROUND

¶ 5     Respondent is the mother of S.R., who was born on October 31, 2009, and S.W., who was born on October 9, 2015. J.R. is S.R.'s father and resides in Chicago. On April 27, 2020, the State filed a petition for adjudication of neglect on behalf of ten-year-old S.R.[1]  The State alleged that

---

[1]A separate neglect petition was filed on behalf of S.W. and is subject to a separate appeal

S.R. was a neglected minor and her environment was injurious to her welfare because respondent's substance-abuse issues and/or history place S.R. at risk of harm and her father failed to protect or care for her. 705 ILCS 405/2-3(1)(b) (West 2020).

¶ 6     A shelter-care hearing was held the same day via Zoom. Both respondent and S.R.'s father waived their rights to be heard and agreed that there was probable cause of neglect, that there was an urgent and immediate necessity to remove the minor from the home, and that reasonable efforts had been made by the Department of Children and Family Services (DCFS) to prevent removal. DCFS was granted temporary guardianship and custody. Both parents were admonished that they must cooperate with DCFS and the terms of any service plans to correct the conditions that resulted in S.R.'s removal.

¶ 7     The State offered the following factual basis for the petition at the shelter-care hearing. On March 19, 2020, the police were called to respondent's home for a welfare check based on a report that four-year-old S.W. was at home with no supervision. The officers found S.W. alone in the home. While the officers were on scene, respondent returned home and informed them that she left S.W. home alone because she wanted to go smoke marijuana. Respondent could not tell the officers how long she had been gone or where she went. The officers noticed a strong odor of marijuana emanating from respondent. This incident prompted DCFS to open an investigation, which was the twelfth investigation regarding respondent. DCFS implemented a safety plan which provided that both of respondent's children would stay with their maternal grandparents and

_____

(*In re S.W.,* 2022 IL App (2d) 220157-U). Neither of the putative fathers is a party on appeal. Therefore, the proceedings with respect to them will be discussed in this decision only when pertinent to the issues at hand.

respondent would participate in substance-abuse services, undergo a mental-health assessment, and comply with all recommended services. Thereafter, respondent missed two scheduled substance-abuse assessments and failed to participate in a mental-health assessment. On April 24, 2020, DCFS took protective custody of the minors due to respondent's noncompliance. Respondent signed a short-term guardianship agreement which gave the maternal grandparents guardianship over the minors. This was later rescinded immediately prior to the shelter-care hearing.

¶ 8    An adjudicatory hearing was held via Zoom over several dates: July 21, September 8, September 22, and October 6, 2020 (the continuances are attributable to coordinating DNA testing and service of notice in this case and DNA testing in S.W.'s case). Respondent stipulated to the allegations in the petition that S.R. was neglected and her environment was injurious because of respondent's substance-abuse issues and/or history placing her at risk of harm. The court took judicial notice of numerous documents, including several DCFS reports, and heard the testimony of Tina McCullough. McCullough is a child-protection specialist with DCFS and was initially assigned to investigate S.R.'s case. She stated that respondent admitted that she left S.W. at home alone in March 2020 so she could go smoke marijuana. She also stated that S.R. was not at home at the time of the incident. S.R. was in the care of J.R. at that time. Initially, J.R. told McCullough that he was willing to keep S.R. in his care, but he informed her that he changed his mind on April 24, 2020, which is when DCFS took protective custody of both children. J.R. had also declined to cooperate with DCFS. After considering the evidence, the court found S.R. a neglected minor as to J.R. in J.R.'s absence. S.R. was adjudicated neglected, and the court admonished both parents to cooperate with DCFS, participate in all required services, and make reasonable efforts and

reasonable progress to correct the conditions that lead to S.R.'s removal. S.R. was to remain in temporary custody of DCFS. Her placement continued to be with her maternal grandparents.

¶ 9     A dispositional hearing took place on November 16, 2020. Respondent's counsel appeared, but respondent did not. The court reviewed a report prepared by the Court Appointed Special Advocate (CASA), the service plan, the dispositional hearing report, and respondent's integrated assessment. The court noted that respondent's integrated assessment was completed on June 16, 2020, and the following services were recommended: a psychiatric evaluation, substance-abuse evaluation, random drug tests, and individual and family therapy. She was also required to find stable housing and participate in consistent visitation with the minors. The court found that respondent was not cooperating with the agency and not participating in services. As such, respondent was found unfit, unwilling, or unable to properly protect, train, or discipline S.R. S.R. was made a ward of the court. The goal set was for return home within 12 months. Respondent was admonished, in her absence, to cooperate with DCFS, complete all required services, and correct the condition that brought S.R. into custody, or she would risk having her parental rights terminated.

¶ 10    The first permanency review hearing was held on April 20, 2021. Respondent attempted to appear via Zoom, but she was disconnected and did not reconnect. The case proceeded in her absence. The court noted that the parents had done "very little, if anything" regarding services. Respondent had informed her attorney that she scheduled a mental-health assessment and contacted the Renz Center, which is the substance-abuse program at the Ecker Center for Behavioral Health (Ecker Center). Based on the reports, the court found that DCFS had made reasonable efforts to provide services, but respondent had not made reasonable efforts or progress towards the goal of returning S.R. home. The trial court changed the goal to return home pending

status hearing (705 ILCS 405/2-28(B-1) (West 2020)), and respondent was admonished that she must "get going on the compliance with the agencies" to correct the conditions that brought S.R. into foster care.

¶ 11    Another permanency review hearing was held on July 27, 2021.  Respondent appeared. The court reviewed a CASA report, a DCFS report, and a client service plan from July 20, 2021. Referring to the DCFS report, the court found that respondent had not engaged in any services. She had not engaged in substance-abuse services.  Respondent did not sign consents for release of mental-health records so her caseworker could verify respondent's assertion that she contacted Ecker Center. Respondent was asked to complete random drug tests, but she would not give the caseworker her address to facilitate scheduling and notification.  One drug test was scheduled in July, but respondent failed to appear.  Respondent stated that she was employed but provided no documentation in support.  After reviewing the reports and determining that DCFS had made reasonable efforts at offering services and making those services available to respondent, the court ruled that respondent had not made reasonable efforts or progress towards reunification   Finding the prognosis for reunification poor, the trial court changed the goal to substitute care pending termination of parental rights.

¶ 12    On August 18, 2021, the State filed a petition for termination of parental rights and for power to consent to adoption alleging that respondent was unfit because she: (1) failed to maintain a reasonable degree of interest, concern or responsibility as to S.R.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) failed to protect S.R. from conditions within his environment that were injurious to his welfare (750 ILCS 50/1(D)(g) (West 2020)); (3) failed to make reasonable efforts to correct the conditions which were the basis for S.R.'s removal from her care or to make reasonable progress toward S.R.'s return to her care during a nine-month period from November 17, 2020,

through August 17, 2021, after she was adjudicated a neglected minor under section 2-4 of the Juvenile Court Act (750 ILCS 50/1(D)(m) (West 2020)); and (4) had abandoned S.R. (750 ILCS 50/1(D)(a) (West 2020)).

¶ 13   On December 9, 2021, respondent's appointed counsel filed a motion to withdraw. Counsel stated that respondent had not appeared in court since July 27, 2021. Further, counsel had no contact with respondent since that date. Counsel's motion to withdraw was granted, and respondent was given 21 days to retain a new attorney or file her *pro se* appearance.

¶ 14   On January 5, 2022, the case was set for hearing on the State's petition to terminate respondent's parental rights. Respondent appeared via Zoom and stated that she was currently residing at the Community Crisis Center (Crisis Center) in Elgin. The public defender was reappointed to represent her and made an oral motion to continue the hearing on the petition. The motion was granted over CASA's objection. Respondent was admonished that she must cooperate with her attorney and appear in court when required. The court stated that if respondent is unable to make arrangements to successfully connect to the proceedings remotely, she should appear in person.

¶ 15   On January 27, 2022, a permanency review hearing was held. The court reviewed a CASA report, a DCFS report, a service plan from October 2021, and a counseling report from Braden Center. Respondent asked that the goal be changed back to return home, noting that she had started therapy, was employed, and was seeking stable housing. The court agreed with the State and CASA that the goal should remain substitute care pending termination of parental rights. The court noted that S.R. had been in protective custody for nearly two years and deserved permanency. Further, the court noted that although respondent had begun individual counseling in October 2021, she had not completed a psychiatric evaluation, participated in any family therapy, or started

parenting education. Respondent was not regularly visiting with S.R. The caseworker had been unable to observe any visits because respondent had not appeared for scheduled supervised visits. As of the October 2021 service plan, respondent had not completed a substance-abuse evaluation and appeared for only one of three scheduled random drug tests, testing positive for marijuana. She missed four additional drug tests, is currently unemployed, and is living at the Crisis Center and sometimes staying with friends.

¶ 16    Respondent was allowed to make a statement. She stated that she started services in July, but there were numerous delays due to COVID-19 restrictions. She explained that it was difficult for her to make it to the appointments because of her job and lack of transportation. As a result, she had lost her job and ended up getting sick. She acknowledged that she did not have a place to live, but later said she recently found an apartment and a job. She expressed that she felt she was not getting the help she needed from DCFS, that when she asked for help, she was told they could not help her due to COVID-19, and that she had to do everything on her own.

¶ 17    The court found respondent had made some efforts, but those efforts were not reasonable or substantial. The case was set for hearing on the State's petition.

¶ 18    The hearing on the petition to terminate respondent's parental rights convened on February 22, 2022. The trial judge stated that he was informed that respondent wished to voluntarily consent to S.W.'s adoption by his maternal grandparents. Respondent affirmed that she had signed the consent forms and she wished to consent to the adoption. However, while being questioned about giving consent, respondent gave equivocal answers about whether she read the documents thoroughly before signing. When asked if she wanted to proceed to trial, she answered "I want my kids. I agree for my mother to adopt my children. I don't know. Seriously." She also said "I know my rights is [sic] technically are going to get revoked today" and "I want my mom to adopt

my kids because I don't know the outcome." After further discussion with the judge, respondent indicated that she did not understand exactly what was happening, but she stated that she wanted to protect her children and fight for them. The judge concluded that the case would proceed to a trial on the petition. Thereafter, respondent objected and repeatedly stated that she wanted her mother to adopt her children. The judge again asked respondent whether she wanted to consent to the adoption or to go to trial. Respondent replied, "Can I pick both?" Based upon this exchange, the judge ruled that she did not accept the signed consent and the matter would proceed to trial.

¶ 19 The trial court commenced the unfitness phase of the proceedings to terminate respondent's parental rights. This hearing took place over the following dates: February 22, March 4, and April 8, 2022.

¶ 20 Kayla Milakis, a caseworker with Youth Services Bureau of Illinois Valley (YSB), testified. She was assigned to S.R.'s case from May 2020 until November 2021. She testified as to the services detailed in respondent's integrated assessment. Milakis testified that respondent had completed a mental-health assessment at Braden Center and started individual counseling, but she had otherwise failed to complete any other recommended services. Milakis stated that respondent was often not cooperative and communication with her was very inconsistent. Respondent frequently did not answer her phone and did not return phone calls. Respondent also did not sign the consents she was asked to sign. Milakis testified that at the beginning of this case, respondent was living in a three-bedroom apartment near the grandparents, but she later learned that respondent was evicted and moved to Chicago. Milakis said that she did not hear from respondent between October 2020 (when she observed a visit between respondent and her children) and January or February of 2021 (when respondent told her she was having difficulties with housing and had moved to Chicago). Regarding visitation, Milakis testified that respondent's

visitation with S.W. and S.R. was inconsistent. After moving to Chicago, she would return "randomly" to see S.R. Respondent reportedly spoke with the children on the phone weekly, and she would stop in and see them once a month. Milakis stated that respondent was not in their everyday lives. Milakis testified that respondent did not comply with random drug testing. Milakis opined that respondent's parental rights should be terminated because of how long the case has been open and her lack of progress or efforts in the required services.

¶ 21    When counsel for CASA questioned Milakis, she testified that respondent's integrated assessment revealed that respondent had previously been diagnosed with schizoaffective disorder and that she also has issues with anxiety and depression. Milakis stated that two administrative case reviews were held regarding the children, but respondent failed to participate in either review. In January 2021, respondent contacted Milakis to inform her that she was living in Chicago, but she refused to give Milakis her address "due to respect to whoever she was staying with." Milakis testified that she sent referrals and information about service providers to respondent, including efforts to refer her for services at the University of Illinois Chicago (UIC) while she was living in Chicago. Respondent was referred for a psychiatric assessment, but she did not make any arrangements to complete it. She never provided Milakis with proof of employment. Milakis testified that when respondent was living in Chicago, the agency offered to facilitate visitation by bringing the children to Chicago to visit her, but respondent did not respond to this offer of assistance.

¶ 22    On cross-examination by respondent's attorney, Milakis testified that throughout the case, respondent reported to YSB that she was engaged in services at Ecker Center. However, respondent never signed any consents for the release of her records, and Milakis could not verify that respondent engaged in any therapy or even called Ecker Center without signed consents. After

learning that respondent had moved to Chicago in January 2021, Milakis also learned respondent had not actually completed any services at Ecker Center. Milakis explained that she found out that respondent had previously contacted the Ecker Center, but during her intake interview respondent revealed that she had lost her job and was unable to pay for services based on their sliding scale. At this point, because respondent had moved to Chicago, Milakis made efforts to arrange services for respondent at UIC. Respondent was given information about the UIC program and reported that she would follow up, but she never did. Milakis did not make further inquiries with UIC because she subsequently learned respondent had already moved back to Carpentersville. Milakis learned that around June 2021, respondent contact the Ecker Center again, but respondent was still unable to pay for services on their sliding scale. Milakis referred respondent to Braden Center where respondent was put on a waiting list. Respondent's referral to Braden Center was accepted in August 2021 for her to commence services. By this time, the goal in this case had already been changed to substitute care pending termination of parental rights. Milakis stated that sometime thereafter respondent contacted Braden Center, completed a mental-health assessment, and started individual counseling. However, to her knowledge, respondent had not completed a substance-abuse assessment or any substance-abuse treatment and had not complied with random drug testing.

¶ 23    Regarding visitation, Milakis stated that initially, respondent had biweekly in-person visitation during COVID-19 restrictions. In April 2021, the schedule was set for weekly visitation, but because the children were placed with their grandparents, respondent was allowed to visit any time. Milakis testified that during her home visits with S.W. and S.R., the children informed her that they "barely talk" to respondent and that they spoke with her on the phone, but she did not spend much time with them. When asked whether there was any agency supervision of visits after

April 2021, she stated no because respondent was not regularly visiting with the children during that time.

¶ 24 Mark Harvey of YSB was called to testify. He is the foster-care caseworker who was assigned to take over S.R.'s case in October 2021. He first spoke with respondent in December 2021, when respondent expressed her frustration that no one was helping her access the required services. At this time, Harvey stated that he contacted Braden Center to confirm everything was set for respondent to continue individual counseling, which had commenced in October 2021. Harvey testified that he asked for a counseling report from Braden Center on the day of the hearing and was informed by respondent's counselor that respondent had not attended the last three scheduled sessions. Harvey scheduled three random drug tests for respondent, two in December 2021 and one in January 2022. Respondent appeared for one test in December, and she was negative for all substances. She did not appear for the other two tests. Harvey stated that respondent had not completed any other services. Regarding visitation, the grandparents informed Harvey that respondent stops by regularly and visits, but Harvey testified that he had only observed one visit.

¶ 25 When questioned by counsel for CASA, Harvey confirmed that when he became S.R.'s caseworker in October 2021, the goal in this case had already changed to substitute care pending termination of parental rights. He stated that respondent was referred to parenting classes in June or July 2021, but she never started. Respondent reached out in the February 2022 to see if she could begin parenting classes, but her referral had expired.

¶ 26 The State asked the court to take judicial notice of, *inter alia*, the shelter-care, adjudicatory, and dispositional orders in this case. The State moved for admission into evidence a number of documents, including the integrated assessments, several service plans, and several YSB reports.

¶ 27     Counsel for CASA called Leti Cruz to testify.  Cruz was assigned as the advocate supervisor on S.R.'s case in December 2021.  Cruz stated that according to the grandmother, respondent stops by daily to see the children.  She testified regarding a home visit she made on December 30, 2021. She observed a verbal altercation between respondent and the grandmother, explaining that respondent was upset and blamed the grandmother for getting DCFS involved in her life.  During this altercation, respondent walked out of the home and the grandmother locked the door behind her.  Respondent then hit the side of the home with a closed fist and knocked on the door. Cruz stated that S.R. and two other children were upstairs during the confrontation, and she believed their voices were loud enough that the children could have heard it.

¶ 28     Respondent testified on her own behalf.  She stated that she did not have a good relationship with McCullough, the first social worker assigned to her case.  She explained that McCullough would not return her calls or give her complete information when respondent talked to her. Respondent stated that she called Ecker Center on her own around April 2020 seeking to arrange the services she needed and there was some confusion regarding insurance, referrals, and as to whether she was seeking services on her own or pursuant to a pending legal proceeding.  She stated that COVID-19 created difficulties in obtaining services because there were limited appointments and waiting lists. She testified that there was a 10- to 12-week waiting period to see a therapist, but she did finally start seeing a therapist at Ecker Center.  However, she also testified that she did not begin seeing a therapist there before she moved to Chicago. She asserted that during this time she was in communication with Milakis, and she acknowledged that there was some confusion about where she was supposed to be going for services, Ecker Center or Braden Center.

¶ 29     Respondent testified that after being evicted in January 2021, she lived in Chicago, staying in three or four different hotels and with several different relatives.  She also stated that she moved

to Chicago because she did not want to go back to a shelter and had nowhere else to go. She contended that her caseworkers would not help her find housing after she was evicted. However, she also acknowledged that she informed her caseworker that she decided to stay in Chicago to be closer to family. Respondent returned to Carpentersville in August or September 2021. When asked if she kept in contact with her caseworker during her time in Chicago, she said she spoke with her several times. Respondent acknowledged that Milakis arranged services for her at UIC, but respondent stated she never followed up. When she moved back to Carpentersville, she stayed with friends and then moved to the Crisis Center. She testified that she had several temporary jobs during this time, but she was unemployed as of November 2021.

¶ 30    When asked about visitation, respondent explained that she tried to see her children as often as possible. While living in Chicago, she said she did her best to visit her children, either by talking on the phone or finding transportation to go see them. She testified that she has issues with her mother taking care of her children because she never had a healthy relationship with her mother and her mother does not like being around her. When asked whether she has ever sought to arrange visitation and been denied, she said no.

¶ 31    Respondent testified that she began counseling in October 2021. She said that she participated in parenting classes via telephone on Saturdays, when asked further, she admitted that she attended only once "because it was hard to get through the lines." She also stated that she requested referrals for a substance-abuse assessment and treatment but never received one. She then testified that she did a substance-abuse assessment, and no counseling was recommended. She later stated that she would see a counselor from Braden Center every month as a part of a substance-abuse treatment program. Respondent testified that she completed "a lot" of random drug tests, stating it was more than seven, and she tested positive on "three to four" of them. She

explained to her caseworker that the reason she had positive tests was "I had deaths in the family, depression, my thyroid." Respondent asserted that she only missed one or two drug tests and it was because she got off work late. Respondent testified that she wants to continue to work on the services necessary to have the children returned to her.

¶ 32     Counsel for CASA asked respondent about the incident leading to the removal of her children. Respondent acknowledged that she left S.W. home alone, but she denied that it was because she wanted to smoke marijuana. She denied another incident in 2018 when she purportedly left both of her children home alone. Respondent disputed testimony that McCullough provided referrals or information for respondent to obtain substance-abuse and mental-health services at Ecker Center. Respondent said she went to Ecker Center in April 2020 (during the COVID-19 lockdown) and a receptionist there told her there were no referrals. She later acknowledged McCullough told her about an appointment scheduled for April 27, 2020, at Ecker Center. Respondent told McCullough that her neighbor would take her to the appointment, but she did not go because her neighbor backed out. Respondent admitted that she was upset about having to complete services because she had already completed these services in Chicago before this investigation was opened. She explained there was a previous DCFS case in Chicago as a result of "a lot of false calls being made." She stated that she completed parenting classes and had a psychiatric evaluation and worked with a "peer counselor" who helped her engage in services. In June 2021, respondent went to Ecker Center for a second intake interview. She admitted that she never engaged in substance-abuse services at Ecker Center. Instead, she stated that she began substance-abuse services at Braden Center in October 2021.

¶ 33     When questioned about random drug tests again, respondent stated that she completed all of the drug tests she was asked to do between May 2020 and October 2021. She asserted there

were three or four tests and all of the results were negative. She then acknowledged that one was positive, and she admitted to using marijuana and knowing the result would be positive. She told Milakis that she used marijuana to "self-medicate" and she told her previous caseworker, McCullough, "that after being diagnosed with thyroid that I started smoking Marijuana a lot because I was told by my endocrinologist that that was a way to decrease the inflammation in my thyroid gland." She acknowledged that at the time of her integrated assessment, she reported that she smoked marijuana about four times per week. She admitted that she continues to smoke marijuana twice a week. Respondent acknowledged that she was unable to obtain a medical marijuana card. Respondent testified that she was currently staying with a friend where she sleeps in the living room. She also has been using the services of the Crisis Center since October 2021.

¶ 34 The court heard closing arguments on April 19, 2022, and issued its ruling as to the fitness phase of the proceedings three days later. The court found the State proved, by clear and convincing evidence, that respondent was unfit because she failed to: maintain a reasonable degree of interest, concern or responsibility as to S.R.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); protect S.R. from conditions within her environment that were injurious to her welfare (750 ILCS 5/1(D)(g) (West 2020)); and make reasonable efforts to correct the conditions which were the basis for S.R.'s removal from her care or to make reasonable progress toward S.R.'s return to her care during a nine-month period from November 17, 2020, through August 17, 2021, after she was adjudicated a neglected minor (750 ILCS 50/1(D)(m) (West 2020)). The court found that the State had not proven the allegations that respondent had abandoned S.R. (750 ILCS 50/1(D)(a) (West 2020)). The trial judge stated that respondent's testimony was "largely not credible, was also very disjointed and, frankly, rather confusing in relation to timeframes that she was trying to give in relation to when she was allegedly receiving services at different locations." The judge found the

testimony of the DCFS and YSB employees to be credible, specifically noting that Milakis stated that respondent did not ask her about services until April 2021. The court described in great detail respondent's lack of interest and concern in this case, including, failing to cooperate and communicate with her caseworkers, failing to complete any services, failing to appear at numerous court hearings, failing to comply with random drug testing, and failing to engage in consistent visitation with the children.

¶ 35 The case proceeded to the best-interest phase of the termination proceedings. The State called Harvey, the YSB caseworker assigned to S.R.'s case since October 2021. He testified that S.R. is currently 12 years old and in the care of her maternal grandparents. They live in a single-family home in Elgin. Her 6-year-old brother, S.W., and her 20-year-old cousin live there as well. He described S.R.'s foster family as a typical loving family. He testified that S.R. is doing well. She had been in individual therapy for a while but was discharge approximately two months before the hearing. Both children have adjusted to living with their grandparents. The grandparents are willing to adopt the children and provide for their needs. The best-interest report prepared by CASA was admitted into evidence.

¶ 36 Respondent testified on her own behalf. When asked if she believed it was in the best interests of her children to live with their grandparents, respondent replied "I don't know—I don't—I agree with it and I disagree with it." She testified that the grandmother allows S.R. to talk to respondent in a disrespectful way. She also expressed concern that the children were not being treated equally. She explained that she is the youngest of 13 siblings and felt mistreated, neglected, bullied, and like she could never get her mother's approval. She described difficulties growing up in a home with so many siblings. She testified that she felt that the best interests of her children would be to live with her. She explained, "Besides waking up every day and having

a chance to redeem myself, that is the only—that's the only place I got love from." She stated that she found an apartment and is "working towards the classes" to try to regain custody of her children. She said that she wanted her children to be with her parents because she would at least have the opportunity to see them, but she did not trust her parents to have her children because of the way her mother allows them to disrespect her.

¶ 37    After consideration of the statutory best-interests factors, the court found that it was in S.R.'s best interests that respondent's parental rights be terminated and that DCFS be given authority to consent to her adoption by her maternal grandparents. Referring to the CASA report, the court noted that the children have lived with their grandparents for two years and they are in a home where they are well cared for and loved. The children do well in school. Their grandparents are engaged with the children, taking them to church activities and the park. The grandparents and the children share the same cultural and religious background and maintain a strong connection with extended family. They host family barbeques and facilitate interaction with cousins, including sleepovers when there is no school. Though S.W. misses his mother, the children appear happy to be living with their grandparents. S.R. has stated that she wishes to be adopted by her grandparents. Respondent continues to have contact with the children, and the court hoped that would continue as long as it is in the children's best interests. All of the children's needs are being met by the grandparents who are willing and able to adopt. The court's decision was issued in a written order on April 19, 2022. This appeal followed. The trial court appointed counsel to represent respondent on appeal. As previously noted, appellate counsel has to file a motion to withdraw in accordance with *Anders,* 386 U.S. 738.

¶ 38                                    II. ANALYSIS

¶ 39    Appellate counsel identifies the following potential challenges to the unfitness finding in his motion to withdraw pursuant to *Anders*—a contention that the trial court may have considered evidence outside of the relevant nine-month time period when finding respondent unfit for failing to make reasonable efforts to correct the conditions which were the basis of S.W.'s removal; a challenge to the finding that respondent failed to make reasonable efforts to correct the conditions which were the basis for S.W.'s removal; and a challenge to the finding that she failed to maintain a reasonable degree of interest, concern, or responsibility as to S.W.'s welfare.

¶ 40    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.,* 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interests. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.,* 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding as to parental unfitness or a child's best interests unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.,* 2017 IL App (2d) 160657, ¶ 16.

¶ 41    Furthermore, it is well settled that "[W]hen parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court." *In re Tiffany M.*, 353 Ill. App. 3d 883,

891 (2004) (citing *In re D.D.,* 196 Ill. 2d 405, 433 (2001)). Hence, if we affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds. After careful review, we agree that there would be no arguable merit to a challenge to the court's finding of unfitness because, at a minimum, the court's finding that respondent failed to make reasonable progress toward reunification during the designated nine-month period is not contrary to the manifest weight of the evidence.

¶ 42    The question of reasonable progress is an objective one, which requires the trial court to consider whether a parent's actions during a given nine-month period would support the court's decision to return the child home in the near future. *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. The court will consider the parent's compliance with the service plans and the court's directives. *In re C.N.,* 196 Ill. 2d 181, 216-17 (2001). For there to be reasonable progress, there must be, at a minimum, some measurable or demonstrable movement toward the goal of reunification. *In re J.O.,* 2021 IL App (3d) 210248, ¶57.

¶ 43    The record shows that respondent made no measurable movement toward the goal of reunification between November 17, 2020, and August 17, 2021, due to her own persistent lack of cooperation and follow-up with YSB. After her integrated assessment in June 2020, respondent was recommended to receive mental-health and substance-abuse assessments and follow through with all recommended services. She was also recommended to complete a parenting program and participate in random drug tests. She was also required to find stable housing and participate in consistent visitation with her children. At the first permanency review hearing on April 20, 2021, the court found that respondent had done "very little, if anything" regarding services. Unfortunately, this remained the status of her efforts and progress throughout the relevant nine-month timeframe.

¶ 44    Milakis was the social worker assigned to this case during the relevant time period. She testified that respondent was often not cooperative and communication with her was very inconsistent. Respondent would often not answer her phone or return calls. In fact, Milakis did not hear from respondent between October 2020 (when she saw her at a supervised visit with the children) and January or February 2021 (when respondent informed Milakis that she had moved to Chicago). After being evicted from her apartment in Carpentersville, respondent moved to Chicago in January 2021, where she stayed in various hotels and with several different family members. Respondent refused to provide her address in Chicago to Milakis. At this time, Milakis also learned that respondent had not actually completed any services at Ecker Center, despite respondent's claims to the contrary. Upon learning this, Milakis made efforts to arrange services for respondent in Chicago at UIC. Respondent told Milakis that she would follow up at UIC, but she never did. When Milakis learned that respondent moved back to Carpentersville in the spring of 2021, Milakis made another referral for respondent to begin services at Braden Center which was ultimately approved in August 2021.

¶ 45    Furthermore, respondent did not complete a substance-abuse assessment or otherwise engage in substance-abuse services. She was required to comply with random drug tests, but Milakis stated that respondent would not provide her address when she lived in Chicago so Milakis could make those arrangements and provide proper notice. Respondent admitted to failing numerous drug tests and acknowledged that she continued to smoke marijuana multiple times a week. Milakis encouraged respondent to obtain a medical marijuana card if her use of the substance was for medical purposes as she claimed, but respondent failed to do so.

¶ 46    Respondent's efforts regarding visitation further demonstrate no measurable movement toward the goal of reunification. Because the children were in the care of their maternal

grandparents, respondent could see them whenever she wished. However, after she decided to move to Chicago, visitation became very inconsistent. Respondent would speak to the children on the phone weekly and stop by to see them once a month. Not wanting lack of transportation to be an impediment to visitation, Milakis testified that YSB offered to take the children to Chicago to see respondent, but she did not accept this assistance. During home visits, the children informed Milakis that they "barely talk" to respondent and respondent did not spend much time with them. Milakis testified that because visitation was inconsistent, no supervised visits occurred during approximately the last five months of the relevant time period (after April 2021) to enable YSB to observe respondent with the children.

¶ 47    The record reveals that respondent had many opportunities to engage in services to make progress towards reunification and to demonstrate a desire to reunite with S.R. by cooperating with YSB, engaging in services, and consistently participating in visitation. However, she failed to do so at every turn. Therefore, we conclude that the trial court's finding of unfitness due to respondent's failure to make reasonable progress towards the goal of reunification was not contrary to the manifest weight of the evidence; as such, there is no arguable merit to a challenge to this finding. Because any one ground for unfitness, properly proved, is sufficient to affirm (*In re Janine M.A.,* 342 Ill. App. 3d 1041, 1049 (2003)), we need not address appellate counsel's other potential issues regarding the unfitness finding.

¶ 48    Finally, we note that appellate counsel stated in his memorandum in support of his motion to withdraw that he considered the trial court's decision that it was in S.R.'s best interests that respondent's parental rights be terminated; however, he concluded that he could not make a good-faith argument that this decision was against the manifest weight of the evidence. After reviewing

the record, we agree. As such, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 49                                  III. CONCLUSION

¶ 50    After examining the record, the motion to withdraw, and the supporting memorandum of law, we agree with appellate counsel that respondent's appeal presents no issues of arguable merit. Thus, we grant the motion to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 51    Affirmed.