2025 IL App (1st) 242265-U

SECOND DIVISION
August 12, 2025

No. 1-24-2265

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| In re K.B. and L.W., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos.    19JA0683 |
| v. | ) |            20JA1011 |
| | ) | |
| J.D., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Andrea M. Buford, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's order terminating respondent mother J.D.'s parental rights as to K.B. and L.W. is affirmed where the trial court's finding of parental unfitness was not against the manifest weight of the evidence.

¶ 2    Respondent J.D. appeals the trial court's order finding her to be unfit under sections 50/1(D)(b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2022)) and terminating her parental rights over her minor children, K.B. and L.W. She argues that the trial

court's finding was against the manifest weight of the evidence because: (1) she had made reasonable efforts to correct the conditions which were the basis for the removal of the minors and reasonable progress toward the return of the minors within the specified nine-month statutory periods under section 1(D)(m) (750 ILCS 50/1(D)(m) (West 2022)) and section 2-29 (705 ILCS 405/2-29 (West 2022)); and (2) she continually showed interest, concern, and responsibility for her children throughout the proceedings as required under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)) and section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 (West 2022)).

¶ 3    K.B., a male child, was born on May 12, 2017. L.W., a female child, was born June 27, 2020. Respondent is the natural mother of both minors.[1]

¶ 4    A petition for adjudication of wardship for K.B. was filed on July 1, 2019, alleging that K.B. was neglected due to an injurious environment pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)), and abused due to the infliction of physical injury under section 2-3(2)(i) of the Juvenile Court Act (*id.* § 2-3(2)(i)) and a substantial risk of physical injury under section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)). The supporting facts for these allegations stated:

> "Mother has one prior indicated report for substantial risk of physical
> injury/environment injurious to health and welfare by abuse. On January 10, 2019
> an intact case was opened to offer services to this family. Mother is non-
> compliant with services including therapy, parenting classes and completing a
> mental health and substance abuse assessments to see if treatment was needed.

---

[1] Joshua M. was named in the petition for adjudication of wardship as K.B.'s father and a default order was entered against him and all whom it may concern. He is not a party to this appeal. Edward W. was determined to be L.W.'s father and is deceased.

Mother admits to smoking marijuana and states she was previously diagnosed with bipolar disorder. On June 27, 2019 the apartment where mother and minor were residing at was observed to have a strong odor of marijuana emitting throughout. The [Department of Children and Family Services (DCFS)] investigator had concerns with the condition of the apartment if minor was to remain there. On that same date, this minor was observed to have multiple marks and bruises on various parts of his body. Medical personnel diagnosed this minor with child maltreatment syndrome. There was a domestic altercation between her and paramour in May of 2019. Mother resides with her paramour. Putative father's whereabouts are unknown. Paternity has not been established."

¶ 5    A petition for adjudication of wardship for L.W. was filed on July 9, 2020, alleging that L.W. was neglected due to an injurious environment pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)), and abused due to a substantial risk of physical injury under section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)). The supporting facts for these allegations stated:

"Natural mother has one prior indicated report for substantial risk of physical injury/environment injurious to health and welfare by abuse. Natural mother has two other minors not in her care and custody one of which is in the temporary custody of DCFS with findings of probable cause for abuse and neglect having been entered. Mother was previously non-compliant with offered and recommended intact family services as to this minor's sibling and is currently in need of ongoing reunification services. In June 2019, this minor's sibling was observed to have multiple marks and bruises on various parts of his body after

3

which medical personnel diagnosed that minor with child maltreatment syndrome. Natural mother and putative father have a history of domestic violence including an incident which occurred during mother's pregnancy with this minor wherein putative father struck her in the abdomen and ribs. There is currently a domestic violence order of protection limiting contact between mother and putative father. Mother has not been forthcoming about where she resides currently and has expressed an intention to reside with putative father. Paternity has not been established."

¶ 6     The trial court entered an adjudication order for K.B. on April 16, 2021, finding that K.B. had been neglected due to an injurious environment and abused due to a substantial risk of physical injury.

¶ 7     On May 11, 2021, the trial court conducted an adjudication hearing for L.W. and combined disposition hearing for K.B. and L.W. The adjudication order found that L.W. had been abused or neglected due to an injurious environment. The parties stipulated to the facts at the hearing. If called to testify, an investigator would testify that respondent hid her pregnancy with L.W. from her caseworker and told the hospital where L.W. was born that she had custody of all her children because she was afraid L.W. would be taken from her care. Respondent had not completed reunification services for K.B. If called to testify, a DCFS caseworker would testify that respondent had outstanding services. She was engaged in but had not completed individual therapy and parenting coaching. Respondent had successfully completed parenting classes. The caseworker was unaware that respondent was pregnant with L.W.

¶ 8     The May 2021 disposition orders for both minors found that it was in their best interest to be adjudged wards of the court. Respondent was found unable to care for, protect, train, or

discipline K.B. and L.W. The permanency order set the goal of return home within 12 months and that respondent had not made substantial progress towards the return home of the minors and respondent "has not consistently engaged in or made significant progress in services." Respondent was granted day visits supervised by a DCFS or private agency caseworker.

¶ 9        Subsequent permanency hearings were conducted between November 2021 and February 2024. The order from November 2021 continued the goal of return home within 12 months for both minors and noted that respondent had outstanding services.

¶ 10      A permanency hearing report from DCFS with a family services plan was submitted for the July 2022 permanency hearing. The report indicated that respondent had not made satisfactory progress or reasonable efforts towards the permanency goal. Respondent was not consistent in attending therapy and had failed to appear for four of the five most recent random drug drops. She tested positive for THC and barbiturates at the one drop she attended. Following the hearing, the trial court changed the permanency goal for K.B. to private guardianship and set forth the reasons for this goal, "Return home has been ruled out based on lack of progress in services. [K.B.] knows his mother and has a relationship with her. Maternal aunt wishes to pursue guardianship of the minor." L.W.'s permanency goal was changed to substitute care pending court determination on termination of parental rights with the following reasons for the change, "Return home has been ruled out based on lack of progress in services and inconsistent visitation. [L.W.] has been in this foster home since she was 3 days old. Foster parent wishes to adopt." These permanency goals were continued in January 2023 and August 2023. Following the February 2024 permanency hearing, the permanency goal for both minors was set as substitute care pending court determination on termination of parental rights.

¶ 11    The State filed petitions for the termination of parental rights for both minors. The petitions alleged that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare in violation of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)) and section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2022)), and she had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children and reasonable progress toward the return of the children under section 1(D)(m) (750 ILCS 50/1(D)(m) (West 2022)) and section 2-29 (705 ILCS 405/2-29 (West 2022)). The petitions further alleged that it was in the best interests of the minors that a guardian be appointed with the right to consent to adoption where the children had been living with their foster parents for an extended period of time, the foster parents desired to adopt the minors, and the adoption was in the best interests of the children. The State also filed pleadings specifying multiple nine-month time periods for ground (m) under the Adoption Act for each minor. The dates specified for K.B. were: April 17, 2021 to January 17, 2022; January 17, 2022 to October 17, 2022; October 17, 2022 to July 17, 2023; and July 17, 2023, to April 17, 2024. 750 ILCS 50/1(D)(m) (West 2022). The dates specified for L.W. were: May 12, 2021 to February 12, 2022; February 12, 2022 to November 12, 2022; November 12, 2022 to August 12, 2023; and August 12, 2023, to May 12, 2024. *Id*.

¶ 12    On November 6, 2023, the trial court conducted the termination hearing for both minors with respondent present via videoconference and represented by counsel. The following evidence was adduced at the hearing.

¶ 13    Lanisha Mix testified that she was employed as a caseworker with DCFS and was assigned to this case from December 2020 to February 2023. Respondent had been recommended multiple services, including individual therapy, the nurturing parents program,

domestic violence program, a substance abuse assessment, and random drug testing drops. When Mix was assigned to the case, respondent was not engaged in any of the services and Mix then made referrals. As far as Mix knew, respondent did not have a learning disability and respondent never told Mix that she had such disability.

¶ 14 Respondent successfully completed the domestic violence service in September 2021, but DCFS continued to have concerns about domestic violence in respondent's relationship. Respondent was living with her paramour, and in December 2021, Mix was informed of a fight between respondent and her paramour. She spoke with respondent and offered respondent supportive services, but respondent did not make herself available. Mix was concerned that respondent had been injured, but respondent did not allow Mix to view her. Mix continued to recommend additional domestic violence services for respondent, but respondent never successfully completed those services while Mix was assigned to the case.

¶ 15 Mix also referred respondent to a substance abuse assessment. Mix also requested weekly random urine drops from respondent. Respondent tested positive for THC and barbiturates twice in 2022, in February and May. After the positive tests, Mix explained to respondent that respondent's failure to participate in a substance abuse assessment would prevent the return home of the minors, but respondent still did not participate. Respondent told Mix that she had participated in the substance abuse assessment, but Mix never received a letter of completion or any signed documents to verify respondent's completion.

¶ 16 Respondent participated "sporadically" in her individual therapy. Mix received reports on respondent's therapy progress but was unable to determine if respondent made any significant progress. Respondent's therapist attended the child and family team meetings and stated that respondent was not addressing the issues that brought the minors into DCFS care. When

respondent's initial therapist left, a new therapist was assigned but respondent never met with the new therapist while Mix was assigned to the case. Respondent completed the nurturing parent program, but did not pass the test at the conclusion, which was considered an unsuccessful completion. Respondent was referred again but was dropped from the program due to an argument between respondent and her peers in the class. She was referred another time but only attended twice and then stopped attending. In total, respondent was referred to this program five times but did not successfully complete it while Mix was the caseworker.

¶ 17    In December 2020, respondent was allowed unsupervised visitation with K.B. The visits became supervised in January 2021 after Mix learned that respondent was driving around with K.B. and taking him "to some questionable places." For the unsupervised visit, respondent was supposed to provide a location of the visit to DCFS to allow the agency to "drop in." Respondent did not provide locations and DCFS had concerns about K.B.'s safety. Respondent had supervised visits with L.W. twice a month for two hours, but respondent did not attend visits at the DCFS office in Harvey. The visits were moved closer to respondent's work in June 2022, but respondent remained inconsistent in visitation, visiting about ten percent of the time. During the visits, respondent needed to be redirected to focus on the children.

¶ 18    Kacey Taylor testified that she was employed as a caseworker with the Hephzibah Children's Association and she was assigned to K.B.'s case in November or December 2022 and for L.W.'s case in February 2023. At the time of her assignment, Taylor reviewed the services referred for respondent. She believed that respondent had successfully completed the domestic violence service. Taylor later received documentation for respondent's participation in the substance abuse assessment. Respondent was not participating in individual therapy. Taylor

referred respondent in the middle of 2023 and respondent engaged in therapy, but Taylor did not receive any documentation that respondent was making substantial progress.

¶ 19    Taylor changed K.B.'s goal from return home to termination of parental rights around May 2024. She was unable to recommend that respondent receive unsupervised visits with either child while assigned to the case. Taylor was also unable to recommend that either child return home to respondent. K.B. had a bond with respondent, but L.W. did not have as much of a bond. Taylor testified that respondent had been consistent with visitation.

¶ 20    Multiple service plans from June 2021 to February 2024 were admitted into evidence for the State as exhibits.

¶ 21    Respondent testified that she was unable to complete the referred services because she had multiple surgeries for bunion removals and was in a car accident. As a result, it was difficult for her to travel because it was hard for her to stand on her feet all day. She stated that her records indicated that she had been diagnosed with bipolar disorder. She had completed the parenting class but did not pass the test, completed the outpatient rehabilitation, and was continuing to attend therapy. She told the trial court that she was trying the best she could as a mother and was not perfect. She did not have any guidance or a support system. She was sorry to have put her children through this, and she had tried.

¶ 22    In closing arguments, the State asked the court to find respondent unfit under both grounds. The State specified the following nine-month statutory periods as the basis for ground (m): (1) for K.B., from April 17, 2021 to January 17, 2022, and from January 17, 2022 to October 17, 2022; and (2) for L.W., from May 12, 2021 to February 12, 2022, and from February 12, 2022 to November 12, 2022.

¶ 23    The trial court found respondent was unfit by clear and convincing evidence and she failed to maintain a reasonable degree of interest, concern or responsibility as to her children's welfare. The court explained its findings as follows.

> "She has failed to make reasonable efforts to correct the conditions for the basis for the removal and failed to make reasonable progress towards the return home of the children to her.
>
> The Court finds that the testimony of Ms. Mix was credible. And that the testimony of Ms. Taylor was not as credible in that she did not have a clear recall on the specifics of this case.
>
> The mother failed to complete all the services necessary including a failure to reengage in domestic violence services after [domestic violence] incidents continued after the initial completion of her [domestic violence] services.
>
> She has failed to complete the substance abuse assessment or she continued to test positive. She did not make significant progress in individual therapy or address the issues that brought the family into care.
>
> She did not successfully complete [nurturing parent program] after multiple re referrals during this -- and this is all during the relevant time period.
>
> ***
>
> Mother's visit[s] were described as inconsistent. She made approximately ten percent of the visits possibly due to location of the visits.
>
> The Court ordered the visits take place closer to mom's home. The visits continued to be inconsistent. Again making only about ten percent of the visits.

There were also safety concerns during the visits. And for those reasons the state has met its burden by clear and convincing evidence."

¶ 24    The court then proceeded to the best interest portion of the hearing.

¶ 25    Taylor testified that the minors were placed in separate foster homes. K.B. was placed with a maternal aunt at his maternal grandmother's home. He has been in this placement since coming into DCFS care. Taylor or someone from the agency visited the home and found it safe and appropriate with no signs of abuse, neglect, or corporal punishment. K.B. was in the second grade and had a 504 plan. K.B. is not on medication and has been engaged in individual therapy. K.B. is bonded with his foster mother and has called her mom.

¶ 26    L.W. was placed with a nonrelative foster home. The home is safe and appropriate with no signs of abuse, neglect, or corporal punishment. L.W. suffered a traumatic brain injury in a previous foster home and received specialized care, including physical therapy, occupational therapy, and speech therapy. Taylor stated L.W. has an "IEP" and was attending a prekindergarten class. Her foster mother understood and was able to advocate for L.W.'s special needs. L.W. was bonded to her foster mother and referred to her foster mother as "mommy." L.W. was always happy around her foster parent.

¶ 27    Taylor stated that she met with her supervisor two weeks before the hearing and it was determined that it was in the children's best interest to have their parental rights terminated. Taylor explained that it was in K.B.'s best interest "for the simple fact that his case has just kind of been open for a very long time." She stated that respondent had been given multiple chances to complete services but there had not been much of an effort. It was also in K.B.'s best interest to stay with his foster parent due to the amount of time he had been with her, and he was attached to her. Taylor also found it was in L.W.'s best interest for similar reasons. L.W. does

not "really know the mom" and was attached to her foster mother. L.W. does not have that bond with respondent.

¶ 28    Brianna M. testified that she had been L.W.'s foster mother for almost three years and wished to adopt her. L.W. is part of the family and has been integrated into the extended family. She was willing to continue the sibling bond with K.B.

¶ 29    Jasmin D. testified that she was K.B.'s maternal aunt and K.B. had been in her care for six years. She wished to adopt K.B. because they have a connection and he is part of the family. She planned to continue the relationship with L.W. if allowed to adopt K.B.

¶ 30    At the conclusion of the hearing, the trial court found it was in the children's best interest to terminate respondent's parental rights. The court specifically observed that the children deserved permanency and were bonded to their respective foster parents.

¶ 31    Respondent filed a timely notice of appeal of the court's ordering terminating her parental rights for both minors.

¶ 32    On appeal, respondent argues that the trial court's finding of unfitness was against the manifest weight of the evidence. More specifically, she asserts that the State failed to meet its burden of proof that she was unfit under either ground by clear and convincing evidence. Both the State and the Guardian maintain that the trial court's unfitness findings were not against the manifest weight of the evidence.

¶ 33    Respondent does not challenge the trial court's best interest finding at the termination hearing. Accordingly, respondent has forfeited any argument that the trial court's best interest ruling was against the manifest weight of the evidence and we will not consider this issue on appeal. See *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26; see also Ill. S. Ct. R. 341(h)(7) (eff. Oct.

1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.")

¶ 34    Respondent contends that the State failed to establish by clear and convincing evidence: (1) her failure to make reasonable efforts or progress toward reunification in the specified nine-month time periods pursuant to ground (m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2022)); and (2) her failure to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare pursuant to ground (b) of the Adoption Act (*id.* § 1(D)(b)). According to respondent, the evidence demonstrated that she visited her children and attempted to complete all assessed services and Mix's testimony lacked specificity and was contradicted by Taylor's testimony.

¶ 35    The authority to involuntarily terminate parental rights in Illinois is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act. *In re M.I.*, 2016 IL 120232, ¶ 19. This policy favors parents' superior right to the custody of their own children. *Id.*

¶ 36    The termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined by section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2022); 705 ILCS 405/2-29(2) (West 2022). The finding of parental unfitness must be shown by clear and convincing evidence. *In re Adoption of K.B.D.*, 2012 IL App (1st) 121558, ¶ 196. Second, after the parent is found unfit, the circuit court then considers whether it is in the best interests of the children to terminate parental rights. *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. The child's best interests are not considered by the trial court when considering parental unfitness. *In re M.I.*, 2016 IL 120232, ¶ 20. Each case concerning parental unfitness is considered *sui generis* and is decided on its own facts and circumstances

presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). The court may not terminate a parent's rights on grounds not alleged in the termination petition and the State is not required to prove every ground it alleged in the petition to support the finding of unfitness. *Id*. at 349. If a single alleged ground of unfitness is proven by clear and convincing evidence, then parental rights may be terminated. *Id*.

¶ 37 This court will not disturb the finding of unfitness unless it is contrary to the manifest weight of the evidence and the record clearly demonstrates that the opposite result was proper. *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 78. We give great deference to the trial court's finding of unfitness, defer to the trial court's factual findings and credibility assessments, and will not reweigh the evidence on appeal. *Id.* This court will only find the trial court's ruling to be against the manifest weight of the evidence when the opposite conclusion is clearly evident from a review of the evidence presented. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 25. Further, we may affirm the finding of unfitness on any basis supported by the record. *In re Brianna B.*, 334 Ill. App. 3d 651, 655 (2002).

¶ 38 The termination petitions for both K.B. and L.W. alleged that respondent was unfit under sections 1(D)(b) and 1(D)(m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2022). After the unfitness hearing, the trial court found respondent unfit under both grounds for both children. The failure to comply with an imposed service plan and infrequent or irregular visitation with the child may support a finding of unfitness under both sections (b) and (m). *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 39 We first review the trial the trial court's finding that respondent was unfit pursuant to section 1(D)(m) of the Adoption Act, for her failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children and reasonable progress toward the

return of the minors during the specified 9-month periods following the adjudication of neglect. 750 ILCS 50/1(D)(m) (West 2022).

¶ 40     The grounds for unfitness set forth in section 1(D)(m) of the Adoption Act are phrased in the disjunctive. *In re C.N.*, 196 Ill. 2d 181, 210 (2001). "Thus, section 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child, *or* (2) the failure to make reasonable progress toward the return of the child." (Emphasis in original.) *Id*. at 210-11.

¶ 41     Reasonable efforts concern the goal of correcting the conditions that caused the removal of the child from the parent. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. The reasonable efforts inquiry is subjective and focuses on the efforts of the parent that would be reasonable for that parent under the circumstances. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 51. This inquiry is narrow because it considers only the correction of those conditions that provided the original basis for removal of the children. *Id*.

¶ 42     Reasonable progress is viewed under an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Progress is considered in light of both the circumstances that gave rise to the original loss of custody as well as any other conditions that later become known. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 57. "At  minimum, reasonable progress necessitates measurable or demonstrable movement toward the goal of reunification." *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Reasonable progress occurs when the trial court can conclude that it will be able to return the child to parental custody in the near future. *Id*.

¶ 43    Termination under section 1(D)(m) contains a timeframe limitation (750 ILCS 50/1(D)(m) (West 2022)), and thus in this section, we narrow our examination of respondent's progress towards reunification, including aspects such as her service plan and regularity of visitation, within the nine-month periods set forth by the State. Here, the State designated the following nine-month periods for each minor: (1) for K.B., from April 17, 2021 to January 17, 2022, and from January 17, 2022 to October 17, 2022; and (2) for L.W., from May 12, 2021 to February 12, 2022, and from February 12, 2022 to November 12, 2022.

¶ 44    The reasonable efforts and reasonable progress grounds are based on respondent's actions to correct the conditions that led to the removal of the minors from her care. Contrary to her argument, the record does not show that she made a reasonable effort to reunify with her children. After completing the domestic violence class, respondent continued in a relationship involving domestic violence and did not reengage with this service. She did not address the reasons why her children were brought into DCFS care. Respondent's argument regarding reasonable progress fails to demonstrate any measurable progress. While she initially completed the nurturing parenting program, her failure of the test made it an unsuccessful completion. She was referred to this class several times but failed to successfully complete it. She did not demonstrate progress in her substance abuse as she missed several random urine drops and tested positive multiple times. She also showed inconsistent progress with both her individual therapy and her visitation with the children.

¶ 45    The service plans encompassing these relevant time periods were admitted as evidence during the termination hearing. Each of the service plans demonstrated that respondent repeatedly failed to make reasonable efforts or progress toward reunification with the minors. She was inconsistent with visitation and therapy. While she completed the domestic violence

service, respondent continued in a relationship involving domestic violence and did not retake the domestic violence classes, as referred. She also failed to engage in her other services, such as, the nurturing parent program, a substance abuse assessment, and drug testing. She was only allowed supervised visitation during these time periods.

¶ 46    The June 2021 service plan detailed that respondent had made "inconsistent progress towards correcting the conditions that placed her children in unsafe environments" and "continued to lack adequate housing and employment." The service plan summarized the family progress since the last review.

> "[Respondent] has been inconsistent with completing recommend services. On 3/8/21, [respondent's] paramour and [L.W.'s] father, Edward W[.]was killed on 119th Michigan Ave, Chicago , IL due to gun violence. [Respondent] is struggling with the loss and has withdrawn from CWS. [Respondent] has a history of enrolling into services and not following through. As of 6/1/21, [respondent] has made an appointment to continue individual therapy with her selected Therapist. She has enrolled in domestic violence counseling, but has not enrolled in substance abuse treatment. She does not have stable housing or employment. Recently, [respondent] has started to engage in regular communication with CWS again. [Respondent] has not visit[ed] with [L.W.] since December 2020 and her visit with [K.B.] are inconsistent. [Respondent] stated she feels uncomfortable visiting with [L.W.] at foster parent home. At the last court hearing the judge order[ed] the visit to be at the DCFS Harvey office. She attended a parent and child visit and sibling visit on 5/21/21."

¶ 47    Similarly, the December 2021 service plan stated that the case remained opened because

respondent continued to make "inconsistent progress towards correcting the conditions that placed her children in unsafe environments," "lack[ed] adequate housing and employment," was "inconsistent with recommended services, individual therapy, substance abuse treatment, and following visitation plan with children." The service plan further detailed the progress since the previous plan.

> "[Respondent] has been inconsistent with completing service recommendations. [Respondent] continues to grieve the loss of paramour. She has not made progress towards correcting the conditions that brought the children into care. [Respondent] has been inconsistent with visitation plan for children majority of this reporting period. On 10/15/21, she started to visit with the children more frequently. The last visit was on 12/3/21. [Respondent] completed domestic violence class on 9/5/21. However, she still has pending services; [nurturing parent program], consistent with individual therapy, substance abuse treatment, drug screen toxicity, employment and stable housing."

¶ 48      The service plan further indicated that respondent had been "inconsistent" with individual therapy. She missed several appointments and refused to address her past and current trauma, substance abuse, why her children were brought into care, and her poor decision making. Respondent's therapy was changed to twice a month and her therapist reported that respondent had been compliant for the last 45 days. Respondent did not complete substance abuse assessment or participate in drug screening during this reporting period. Respondent was unemployed but had received a housing voucher to pay her rent for one year and was seeking housing through the Chicago Housing Authority (CHA).

¶ 49      The June 2022 service plan again indicated that respondent had not made progress toward

correcting the conditions that placed the minors into DCFS care. She remained "inconsistent with recommended services of individual therapy sessions, substance abuse treatment, random drops and following visitation plan with children." The progress summary stated:

> "During this reporting period, [respondent] has not made progress towards correcting the conditions that placed her children into care. She is inconsistent with recommended services of individual therapy sessions, substance abuse treatment, random drops and following visitation plan with children. On 5/27/22, [Respondent] was dropped from [nurturing parent program] class because she did not complete weekly assignments and would not participate in group discussion. CWS completed a Cerap on 5/10/22 of the home. The apartment was not safe and appropriate for children. Additionally, she has a poor support system."

¶ 50    The same issues continued through to the end of the relevant time periods under this ground. The December 2022 service plan covered part of the second nine-month time period. That plan stated that during that reporting period, respondent had "not made progress towards correcting the conditions that placed her children into care. She [was] inconsistent with recommended services of individual therapy sessions, substance abuse treatment, random drops and following visitation plan with children."

¶ 51    Additionally, within the second nine-month time frame, respondent tested positive during random testing drops. On February 16, 2022, and April 13, 2022, she tested positive for THC and barbiturates. She also failed to appear for four drops, which are considered a positive result. The July 2022 permanency hearing report further stated that five random drops were performed between May 18, 2022, and June 24, 2022. Respondent failed to appear for four of the drops and tested positive for THC and barbiturates on the May 27, 2022 drop.

¶ 52    Further, Mix, the caseworker during these specified time periods, provided compelling testimony about respondent's failure to make reasonable progress as required under the statute. The trial court specifically found Mix to be "credible." In all of these service plans, Mix found that respondent was making unsatisfactory progress in her services. Respondent's apartment was also found "not safe and appropriate for children."

¶ 53    Mix testified that respondent completed the domestic violence class in September 2021 but continued to reside with her paramour and a domestic violence incident occurred in December 2021. Based on that incident, respondent was referred again to the domestic violence services, but she failed to participate. Mix also stated that while respondent took the nurturing parent class, she failed the test at the conclusion. Respondent was repeatedly referred to the nurturing parent class, but she failed to complete it. Respondent did not provide proof of her completion of the substance abuse assessment while Mix was the caseworker, but Taylor testified that respondent later provided her with a certification for participation between February and May 2022. However, during this time period, respondent repeatedly missed her random drug testing drops and tested positive multiple times.

¶ 54    Further, the service plans and Mix's testimony show that respondent was inconsistent with her individual therapy and the scheduled visitation with her children. Respondent's therapist indicated in team meetings that respondent was not addressing the reasons the case came into the system. Mix was unable to determine if respondent made any significant progress in her therapy. During visitation, Mix needed to redirect respondent to focus on the children. Mix testified that respondent had been "sporadically visiting throughout the case." Throughout the relevant time periods, respondent was allowed only supervised visitation with each of the minors.

¶ 55    Respondent contends that she made "movement by completing her domestic violence

20

classes, her substance abuse assessment, completing her parenting class and by increasing the consistency of her visits." However, respondent's argument regarding reasonable progress fails to demonstrate any measurable progress. She failed to reengage with domestic violence after a fight with her paramour in December 2021. While respondent completed the nurturing parenting class, her failure of the test was considered an unsuccessful completion. She was repeatedly referred to the class but failed to complete it. As the June 2022 service plan noted, respondent was dropped from the class for failing to complete assignments and refusing to participate in group discussions. Although respondent did complete the substance abuse assessment, respondent also routinely either missed her random drug tests or tested positive.

¶ 56    The record firmly established that respondent failed to make reasonable efforts and progress toward regaining custody of her children. As previously observed, the reasonable efforts inquiry focuses on respondent's efforts to correct the conditions originally providing the basis for removal of the children. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 51. Reasonable progress, at a minimum, requires measurable or demonstrable movement toward the goal of reunification. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. The record before us fails to show any measurable movement under either basis made by respondent during either of the specified time periods. She failed to consistently engage in services and was sporadic in her visitation with her children. The service plans repeatedly observed that respondent failed to address any of the issues that caused her children to be taken into DCFS care. This does not reflect any reasonable efforts or progress towards reunification during any of the nine-month timeframes set forth for each of the minors. Based on the evidence presented, we cannot say the trial court's finding of unfitness on these grounds was against the manifest weight of the evidence.

¶ 57     Because we have found that the trial court's finding under ground (m) was supported by clear and convincing evidence and not against the manifest weight of the evidence, we need not reach the court's additional finding under ground (b). A trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 47. Since respondent has not challenged the court's best interest finding, we find that the trial court's orders terminating respondent's parental rights to K.B. and L.W. were not against the manifest weight of the evidence.

¶ 58     Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 59     Affirmed.